**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| THOMAS L. TAYLOR III, solely in his capacity as Court-appointed temporary receiver for Breitling Energy Corporation, *et al.*, | § § § § | |
| Plaintiff, | § | |
| | § | Case No.: _____ |
| v. | § | |
| | § | |
| SCHEEF & STONE, LLP, ROGER CRABB, and MITCH LITTLE, | § § | |
| Defendants. | | |

---

## RECEIVER'S ORIGINAL COMPLAINT

---

**CASTILLO SNYDER, P.C.**

Edward C. Snyder
Texas State Bar No. 791699
esnyder@casnlaw.com
Jesse R. Castillo
Texas State Bar No. 03986600
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
Telephone:     210-630-4200
Facsimile:      210-630-4210

***ATTORNEYS FOR THOMAS L. TAYLOR, III***

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................ 1

II.   PARTIES ........................................................................................................................... 3

III.  JURISDICTION & VENUE ............................................................................................. 4

IV.   FACTUAL BACKGROUND ........................................................................................... 5

    A.  The Breitling Fraud

    B.  Defendants' Knowing, Reckless and/or Negligent Participation

V.    STATUTE OF LIMITATIONS DEFENSES ................................................................. 22

    **A.**  Discovery Rule / Inquiry Notice / Equitable Tolling ........................................... 22

VI.   CAUSES OF ACTION ................................................................................................... 23

    **COUNT I: Negligence/Gross Negligence** ........................................................... 23

    **COUNT II: Breach of Fiduciary Duties** ............................................................. 24

    **COUNT III: Aiding, Abetting, or Participation in Breaches of Fiduciary Duties** .......... 24

    **COUNT IV: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme** ................................................................................................. 25

    **COUNT V: Avoidance of Fraudulent Transfers** ................................................ 26

VII.   ACTUAL DAMAGES ................................................................................................... 27

VIII.  PUNITIVE DAMAGES ................................................................................................ 28

IX.   CONDITIONS PRECEDENT ........................................................................................ 28

X.    JURY DEMAND ............................................................................................................ 28

XI.   PRAYER ......................................................................................................................... 28

Plaintiff Thomas L. Taylor III ("Plaintiff" or "Receiver"), solely in his capacity as temporary receiver appointed by orders entered in the civil action styled *Securities and Exchange Commission v. Christopher A. Faulkner, Breitling Energy Corporation, Jeremy S. Wagers, Judson F. ("Rick") Hoover, Parker R. Hallam, Joseph Simo, Dustin Michael Miller Rodriguez, Beth C. Handkins, Gilbert Steedley, Breitling Oil & Gas Corporation, Crude Energy, LLC, Patriot Energy, Inc., Defendants, and Tamra M. Freedman and Jetmir Ahmedi, Relief Defendants*; No. 3:16-cv-01735-D; in the United States District Court for the Northern District of Texas, Dallas Division ("Enforcement Action"), files this Original Complaint ("Complaint") against Scheef & Stone, LLP, Roger Crabb ("Crabb") and Mitch Little ("Little") (collectively, "Scheef & Stone" or "Defendants"), and alleges the following:

## I.     INTRODUCTION

1.      The Receiver brings this action to recover damages sustained by Breitling Oil & Gas Corporation ("BOG"), Breitling Royalties Corporation ("BRC"), Breitling Energy Corporation ("BECC"), Crude Energy, LLC ("Crude Energy"), and Crude Royalties, LLC ("Crude Royalties") (collectively the "Breitling Entities") -- and their alter ego Patriot Energy, Inc. ("Patriot") (collectively with the Breitling Entities, "Breitling") -- as a result of Defendant's intentional misconduct and failure to exercise the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances in conducting their legal representation of Breitling.

2.      Beginning in 2011 and continuing through 2016, Christopher A. Faulkner ("Faulkner") orchestrated a massive fraud through Breitling and other entities under his control, raising approximately $150 million in gross proceeds from investors through the offer and sale of oil and gas-related securities.   During this time, Faulkner (including without limitation

individually and through entities under his control) misappropriated approximately $32.8 million in Breitling funds, both through the receipt of transfers from Breitling accounts (including under the color of expense reimbursements), and through the payment of personal expenses from Breitling bank and credit card accounts. From the inception of the fraud, Faulkner made use of the assets of the Breitling Entities to fund a lavish lifestyle -- including multiple homes across the country, acquisition of luxury goods, and international travel and entertainment.

3.      Commencing in or about April 2010, and continuing through at least the end of 2015, Defendant Scheef & Stone performed various legal services on behalf of the Breitling Entities to facilitate the offer and sale to investors of securities linked to oil and gas-related working interests and royalty interests. The legal services for which Scheef & Stone was engaged to perform and which Scheef & Stone did perform included without limitation (i) the preparation of project-specific Confidential Information Memoranda and Private Placement Memoranda ("CIMs") and other offering-related documents for dissemination to potential investors in connection with the sale of the securities, (ii) purportedly ensuring the Brietling Entities' compliance with applicable securities laws and regulations, and (iii) representation of the Breitling Entities in connection with various investor complaints and regulatory inquiries, including the Securities and Exchange Commission ("SEC") investigation which culminated in the SEC's Enforcement Action. The Breitling Entities relied on Scheef & Stone to provide these legal representations with the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances. As detailed below, Defendants failed in their charge and breached their duties to the Breitling Entities by instead assisting the directors and officers of the Breitling Entities, including Faulkner, to breach fiduciary duties they owed to the entities.

4.     Defendants are liable to the Receivership Estate for damages caused by their breaches of duties owed to the Receivership Entities (1) with respect to preparation and dissemination of materially misleading CIMs and other offering-related documents, and hence, the implementation of fraudulent and unlawful securities offerings which damaged the Receivership Entities; and (2) for the rendition of defective securities compliance advice – including but not limited to advice regarding broker-dealer licensure and securities sales practices and compensation.  Importantly, the foregoing negligent or grossly negligent legal services were performed by Scheef & Stone, in part, while it was aware of -- but did not advise the Breitling Entities to disclose to investors -- the pendency of a major enforcement investigation by the SEC and numerous other regulatory inquiries and investor claims.  As such, Scheef & Stone's conduct also aided and abetted Breitling Entity agents', officers' and directors' breaches of fiduciary duties to the Breitling Entities which enabled said persons to manipulate and utilize the Breitling Entities to carry out a massive fraud.

## II.     PARTIES

5.     Plaintiff Thomas L. Taylor III was appointed as temporary receiver pursuant to Orders entered in the Enforcement Action. *See* Enforcement Action, Case No. 3:16-cv-01735-D (N.D. Tex. 2016), ECF No. 108, as amended by ECF No. 142, as amended by ECF No. 320, as amended by ECF No. 418 (collectively referred to as the "Receivership Order").[1]  Plaintiff currently serves as temporary receiver for the estates of Faulkner, BOG, BRC, BECC, Crude Energy, Crude Royalties (together, "Crude"), Patriot, Breitling Ventures Corporation, Breitling Holdings Corporation, Breitling Operating Corporation, Inwood Investments, Inc. and Grand

---

[1] Unless otherwise specified, citations to the Receivership Order refer to pages and paragraphs in Dkt. 418.

Mesa Investments, Inc. (collectively, excluding Faulkner, the "Receivership Entities") (the "Receivership Estate"). Receivership Order at p. 1, at ¶2. Plaintiff has been appointed over the "Receivership Assets", *id*. at ¶2, which includes "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by…, directly or indirectly," Faulkner and the Receivership Entities. *Id*. at p. 1. The Receiver asserts the causes of action herein on behalf of BOG, BRC, BECC, Crude and Patriot.

6.      Defendant Scheef & Stone, LLP was at all times relevant to this Complaint a Texas limited liability partnership with its principal place of business in Texas located at 500 North Akard Street, Suite 2700, Dallas, Texas 75201. Scheef & Stone will be served through its registered agent or by substituted service through its counsel.

7.      Defendant Crabb was at all times relevant to this Complaint an individual residing in Texas. At times relevant to this Complaint, Crabb was a partner of Scheef & Stone in Dallas, Texas. Crabb will be personally served with citation or served via substituted service through his counsel.

8.      Defendant Little was at all times relevant to this Complaint an individual residing in Texas. At times relevant to this Complaint, Little was a partner of Scheef & Stone in Dallas, Texas. Little will be personally served with citation or served via substituted service through his counsel.

### III.     JURISDICTION & VENUE

9.      This Court has jurisdiction over this action, and venue is proper, as the Court that appointed the Temporary Receiver, and under Section 22(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v(a)), Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and under Chapter 49 of Title 28, Judiciary and Judicial

Procedure (28 U.S.C. § 754). Venue in the Northern District of Texas is proper as at all times relevant to this Complaint because Scheef & Stone's principal place of business in Texas was located in the Northern District of Texas. Additionally, the vast majority of the wrongful conduct alleged herein with respect to Defendants occurred in the Northern District of Texas.

## IV.   FACTUAL BACKGROUND

### A.  The Breitling Fraud

10.     Enforcement Action defendants Faulkner, Parker Hallam ("Hallam") and Dustin Michael Miller Rodriguez ("Miller") founded the Breitling Entities BOG and BRC in 2009 and 2010, respectively. Through these entities -- and later BECC, Crude, and Patriot -- Faulkner orchestrated and implemented a multi-million-dollar fraudulent scheme through the offer and sale of oil and gas securities to investors. With Scheef & Stone's substantial assistance, Breitling solicited and received funds from investors regularly from approximately January 2011 through at least February 2016.

11.     From the inception of BOG and BRC, Faulkner served as said entities' President and Chief Executive Officer, controlled their overall direction, and managed their day-to-day operations.  In such capacity he owed fiduciary duties to said entities.

12.     The main business activity of BOG and BRC was the management and syndication of oil and gas-related investments. BOG offered and sold securities (typically denominated as "Units") related to oil and gas working interests.  BRC offered and sold securities (typically denominated as "Interests") related to oil and gas royalty interests. Potential investors in Faulkner's scheme were identified using lead lists, Google advertisements, and inquiries generated through visitors to the companies' website(s), Faulkner's speaking engagements at conferences and media appearances by Faulkner. BOG and BRC employees also

regularly contacted prospective investors using cold calls.   Such sales practices, of which Scheef & Stone was aware, constituted "general solicitation", nullifying the Breitling Entities' reliance on the Regulation D exemption to securities registration.

13.     The terms of BOG and BRC securities offerings were provided to public investors through offering materials in the form of CIMs prepared by Scheef & Stone. The Breitling CIMs were replete with material misrepresentations and omissions of material facts.  Moreover, BOG and BRC illegally offered and sold these securities through persons who were neither registered with the SEC as brokers nor associated with registered broker-dealers.

14.     At the core of Faulkner's scheme were estimates of how much it would likely cost to drill and complete the wells contemplated in the working interest securities offerings, and consequently how much the investments would likely earn.  Faulkner received estimates for drilling and completion costs -- known as Authority for Expenditures ("AFEs") -- from the operators that actually drilled and completed oil and gas wells. Instead of including these estimates in the CIMs, however, Faulkner, without basis, grossly inflated these estimates and then included his bloated figures in the CIM offering documents provided to investors. BOG then tied the price of units in the investments to these inflated cost estimates and sold the investments on a lump sum or "turnkey" basis to investors.

15.     Because BOG was entitled to retain the investor proceeds it raised in excess of the actual costs of drilling and completing any wells, Faulkner's gross inflation of the AFEs ensured that Breitling would pocket millions of dollars in inflated "profits" from unwitting investors, from which Faulkner could fund his lavish lifestyle.

16.     Faulkner also regularly "over-sold" units in BOG offerings. In this regard, BOG regularly sold to investors a larger percentage of working interests in a prospect than BOG

actually owned. Rather than disclosing this fact to investors, however, BOG and Faulkner covertly skirted their overselling by moving investors out of the oversold prospect and into different prospects, advising investors that BOG was exercising its contractual right to reassign investors to "comparable" prospects. Contrary to the terms of the CIMs, however, BOG often placed investors in materially different substitute prospects in different states with different operators, providing materially different ownership interests than those bargained for by the investors.

17.     In furtherance of Faulkner's scheme, and without disclosure to investors, BOG and BRC extensively comingled the assets they received from investors. Although investor funds were generally received by Breitling in offering-specific accounts, they were almost always transferred thereafter into general "operating accounts" prior to the completion of drilling and other completion costs associated with the offering's respective well(s), and comingled with the proceeds of investors in other, distinct offerings. Funds transferred to these "operating accounts" included the excess of funds illicitly received by Breitling as a result of the grossly inflated AFEs, which defrauded investors believed would be used to fund the working interest prospects underlying the BOG offerings.

18.     Faulkner directed Breitling personnel to pay business expenses from these comingled "operating accounts", sometimes with respect to oil and gas offerings, meaning that one investor's money was necessarily being spent on expenses for a different offering. Moreover, it was from these "operating accounts" that Faulkner directed the payment of credit card bills representing millions of dollars in charges for personal expenses, and from which Faulkner was reimbursed for personal expenses which he claimed, without support, were made on behalf of Breitling.

19.     Pursuant to the CIMs prepared by Scheef & Stone, the offering Breitling Entity was to retain a portion of the royalty interests purchased for the pool of investors, typically 10%. However, the "over-selling" of royalty interests to investors had great potential to impact the offering entity's balance sheet, because of the risk that the conveyance of more than 100% of the royalty interest purchased by the offering entity could effectively be a transfer of the interest retained by the offering entity pursuant to the CIM. In other words, if BRC was supposed to transfer 90% of the royalty interests it purchased with investor proceeds to investors *pro rata*, but instead transferred 120% of the royalty interests it purchased with investor proceeds, it risked losing the 10% retained interest in those royalty interests -- all of its revenue for that offering.

20.     In all of these instances, title to the royalty interests conveyed by the offering entity is, at minimum, clouded vis-à-vis both Breitling's interest and the investors' interests. As a result of these title defects, (i) oil and gas operators have suspended royalty payments to investors and Breitling Entities under the Texas Natural Resources Code, Section 91.402(b); and (ii) these royalty interests are unmarketable for resale. In this regard, the assets of the Breitling Entities were materially affected -- potentially all of the carried interests they were to receive as revenue for the offerings are at risk.

21.     From 2011 through 2013, BOG and BRC raised approximately $81.5 million in gross proceeds from investors. During this period, Faulkner misappropriated over $15 million from company coffers.

22.     In or about 2013, Faulkner conceived to take BOG and BRC public through a "reverse merger" transaction. A reverse merger occurs when a private company merges into a shell company that is already publicly-traded; the private company thereby becomes a public company. The transaction results in a single, publicly-traded entity, the name of which is

changed to that of the formerly private company, and which is controlled by the owners of the formerly private company.

23.     On or about December 9, 2013, BOG and BRC closed the reverse merger transaction through which they acquired the publicly-traded shell company Bering Exploration, Inc. ("Bering Exploration") and renamed it Breitling Energy Corporation (and changed its ticker symbol to BECC). Faulkner, Hallam, and Miller owned over 90 percent of BECC's common stock through their ownership of BOG and BRC. Faulkner became the President and CEO of the public entity BECC.

24.     From December 9, 2013 through February 2016, Breitling raised approximately $68.5 million in additional gross proceeds from investors. During this period, Faulkner misappropriated at least $18.5 million from Breitling.

25.     Contemporaneously with the reverse merger, Faulkner created Crude Energy and Crude Royalties and installed BOG and BRC co-founders Hallam and Miller as the officers for said entities.   Faulkner "outsourced" BECC's sales and marketing activities (previously undertaken by BOG and BRC directly) to Crude, including transferring the BECC sales team and other BECC employees to Crude.   Crude thereafter undertook to market and offer securities to BECC's list of public investors.

26.     The true nature of the relationship between BECC and Crude (and later Patriot) was not disclosed to investors or in public filings with the SEC. BECC's public filings disclosed only that BECC and Crude executed an Administrative Services Agreement ("ASA") contemporaneous to the closing of the reverse merger.   The ASA gave the relationship between BECC and Crude an aura of legitimacy and helped make transactions between BECC and Crude

appear arm's-length in nature. In truth, however, Crude (and Patriot) were mere alter-egos of BECC, and their financials were actually consolidated with those of BECC.

27.     In or about March 2015, following a falling out with Hallam, Faulkner transferred these sales and marketing responsibilities from Crude to a new entity called Patriot, with Miller installed as the primary officer for Patriot. The Patriot entity was created just by changing the name of another shell entity owned by Faulkner, Simple Solutions, Inc., to Patriot and Patriot simply continued Crude's operations under a new name. Faulkner opened new bank accounts styled "Simple Solutions d/b/a Crude Energy" in order to intercept incoming checks intended for investments in Crude's offerings and directed Miller (also an officer of Crude) to assign all of Crude's oil-and-gas working interests to Patriot.  In or about April 2015, BECC executed an ASA with Patriot containing materially equivalent terms to the ASA between BECC and Crude and disclosed it in a public filing.

28.     Pursuant to the ASAs, BECC would give Crude/Patriot access to its client list and oil and gas-prospect list so that Crude/Patriot could market and offer oil and gas prospects to BECC clients.  Per the ASAs Crude/Patriot would also provide various "administrative" services to BECC. In exchange, Crude/Patriot would be entitled to certain "management fees" related to the oil and gas-prospects. The Crude ASA included terms for the payment by Crude to BECC of $100,000 per month, $150,000 per oil and gas-prospect delivered to Crude, and a carried interest of 20% in any prospect acquired by Crude for sale to clients.  The April 2015 ASA with Patriot increased these payments to BECC to $200,000 per month, $250,000 per oil and gas-prospect delivered to Patriot, and a carried interest of 25% in any prospect acquired by Patriot for sale to clients.

29.     In reality, however, Breitling records contain no evidence that either Crude or Patriot made any payments to BECC in connection with the ASAs, and there are no records identifying any recurring monthly payments from Crude or Patriot to BECC for the ASA fees. Rather, Breitling records reflect a repeated and consistent flow of investor funds from Crude and Patriot to BECC. In this regard, Faulkner caused Crude and Patriot to collectively transfer over $39 million to BECC, a majority of all funds received into BECC accounts.

30.     The offering activities of Crude and Patriot mirrored the offering activities of BOG and BRC. Crude and Patriot continued to deliver materially misleading offering documents, including the CIMs, to potential investors, which omitted Faulkner's and BECC's true relationship with Crude and Patriot. The AFEs contained in the CIMs continued to be grossly inflated without any reasonable basis. Investor funds were not only comingled in "operating accounts" but outright transferred to a purportedly independent, arms-length company (BECC) and used to pay hundreds of thousands of dollars for Faulkner's BECC American Express bills, including his personal expenses.

31.     Additionally, BECC actually consolidated Crude's (and later Patriot's) results of operations in its general ledger, a fact never disclosed to the public in BECC's filings or to investors in Crude's offerings. In this regard, Crude cash balances often represented the majority of the funds reported by BECC as its cash balances in filings with the SEC.

32.     As detailed below, Defendants knew (or but for their gross negligence should have known) of Crude's/Patriot's inextricably intertwined connection to the Breitling Entities. Scheef and Stone continued to prepare CIMs for offerings by Crude which were essentially a continuation of the offerings that they had done for BOG and BRC.   Scheef and Stone also counseled Crude to conceal transaction-based compensation to non-registered individuals

through use of a nonsensical and patently fraudulent "bonus" system pursuant to which the sales personnel were compensated in huge amounts for, essentially, showing up and dressing nice.

33.     Because of Defendants' numerous failures in breach of their duties to Breitling, Faulkner was able to continue his fraudulent scheme for years, funding his life of luxury upon millions of dollars of misappropriated Breitling assets. Moreover, Breitling liabilities increased by tens of millions of dollars with respect to more than one thousand innocent investors, and by millions of dollars with respect to the professionals that Breitling eventually had to engage -- including without limitation attorneys and other professionals engaged to defend Breitling in the SEC's investigation and Enforcement Action, and by the Receiver in his administration of the Receivership Estate to date.

**B.  Defendants' Knowing, Reckless and/or Negligent Participation**

34.     Commencing in or about April 2010, and continuing through at least the end of 2015, Scheef & Stone performed various legal services on behalf of the Breitling Entities related to the offer and sale to investors of securities linked to oil and gas-related working interests and royalty interests. The services for which Scheef & Stone was engaged to perform and which Scheef & Stone did perform included without limitation (i) the preparation of the Confidential Information Memoranda and Private Placement Memoranda ("CIMs") and other offering-related documents for dissemination to potential investors in connection with the sale of the securities, (ii) ensuring the Brietling Entities' compliance with applicable securities laws and regulations, and (iii) representation of the Breitling Entities in connection with various investor complaints and regulatory inquiries, including the SEC investigation which culminated in the Enforcement Action. The Breitling Entities relied on Scheef & Stone to conduct these legal representations with the degree of care, skill, and competence that attorneys of reasonable skill and competence

would have exercised under similar circumstances.  As detailed below, Defendants failed in their charge and breached their duties to the Breitling Entities by instead assisting the directors and officers of the Breitling Entities, including Faulkner, to breach fiduciary duties owed to the entities by causing said entities to violate securities laws and commit fraud.

35.    Scheef & Stone represented the Breitling Entities in connection with their primary business -- the offer and sale of securities -- the substance of which included oil and gas working interests (denominated as "Units") and oil and gas royalty "Interests".  In fact, the evidence will show that Scheef & Stone's first service for the Breitling Entities in 2010 involved responding to a regulatory inquiry from the Texas State Securities Board ("TSSB").  Shortly after Scheef & Stone responded to the TSSB on behalf of Breitling Entities, it commenced work on a series of Reg D private placements through which Breitling would ultimately raise approximately $150 million over a period of more than five years.

36.    In addition to working on virtually all of the Breitling Entities' Reg D private placement offerings and counseling Breitling with respect to federal and state securities laws generally, Scheef & Stone also attorneys purported to counsel the Breitling Entities specifically with respect to the legality of utilizing unlicensed securities salespersons to offer and sell Breitling's securities and compensating them based upon their sales production.  Indeed, former Breitling General Counsel Jeremy Wagers has testified that Scheef & Stone advised and supervised all of Breitling's sales practices, and would regularly "come in and tell [the Breitling sales staff] what they could and could not do".[2]   Scheef & Stone ultimately advised Breitling that it did not have to register its sales personnel as securities brokers and instead devised the sales mechanisms and practices for Breitling to evade proper registration of its sales personnel,

---

[2] Wagers Depo., at 120:14-121:5.

including with respect to a patently artificial "bonus" program which was employed to evade well known strictures on sales-based compensation.   It is now known that well in excess of $100 million in securities were sold by unlicensed Breitling salespersons who received commissions which they were not lawfully entitled to receive. And no Breitling Entity was ever licensed as a broker-dealer.   Based upon documentation regarding the legal advice given by Scheef & Stone attorneys in this regard, and later produced in connection with the SEC's investigation, Scheef & Stone knew, or but for its gross negligence or outright complicity in Faulkner's schemes, should have known that Breitling salespersons (other than company officers) were receiving securities transaction-based compensation.

37.     After years of BOG and BRC non-officer salespersons violating federal and state securities laws by offering and selling securities and receiving transaction-based sales commissions without a securities license, Scheef & Stone counseled Crude to implement a similar so-called "bonus" program enabling Crude to continue the same illegal sales practices, evading compliance with securities laws by assigning bonuses purportedly upon such pretextual criteria as attendance and sartorial proficiency.

38.     As the SEC has charged in the Enforcement Action, the Breitling private placement offerings (spanning more than five years) that Scheef & Stone prepared were premised upon material misrepresentations and omissions of material fact which, but for its negligence or complicity in Faulkner's schemes, would have been or should have been discovered by Scheef & Stone during its work involved in facilitating the offerings.   Information of which Scheef & Stone was aware, or should have been aware had it acted with the requisite standard of care and/or had it not been complicit in the illicit schemes, include without limitation:

- Faulkner had little to no experience in the oil and gas industry whatsoever (contrary to representations in the Breitling offering documents), and had several judgment and tax liens against him. It is clear that Faulkner was a control person of all of the Breitling Entities throughout Scheef & Stone's representation (including after the so-called "transition" to Crude).[3]

- Evidence that material misrepresentations were made in the CIMs regarding drilling and other costs, particularly with respect to the Approval for Expenditures ("AFE") documents, attached to the CIMs which Scheef & Stone prepared.

- Evidence that oil and gas units in Breitling offerings were oversold, without disclosure to investors, and that substitution of properties -- where made -- were not made with similar properties as required. Consequently, (1) the Breitling Entities were exposed to claims for rescission and/or damages; and (2) title to oil and gas assets (both in the hands of investors and remaining in the hands of the Receivership Entities) was undermined.

- Evidence that investor funds were not segregated in prospect-specific accounts but were transferred to Breitling operating accounts prior to the completion of well projects.

- Evidence that Breitling resources were used to pay personal expenses of its officers, including DWI fines and individual federal tax penalties and back taxes, and that essentially no accounting controls were in place to detect such improper payments.

- Evidence that Faulkner paid, or was reimbursed for, exorbitant personal expenses with Breitling/investor funds and that Faulkner and Beth Handkins prepared and approved expense reports using generalized expense names such as "Leads" or "Reimbursements." There were no controls in place to prevent massive misappropriation of Breitling funds by Faulkner.

39.     All of the foregoing matters were to become the factual predicates for the SEC Enforcement Action and the attendant collapse of the Breitling fraudulent scheme. Auditors for BOG and BRC readily became aware of all of the foregoing issues as of December 2013 in connection with their audit of BOG's and BRC's 2011 and 2012 financial statements, when the auditors drafted a memorandum "to document the accounting and auditing issues encountered during [their] testing of … significant audit areas…." The auditors noted materially inaccurate

---

[3] Even the provenance of the BOG entity was misrepresented in the offering documents in question.

representations in the CIMs and AFEs; the use of internal and unqualified personnel in drafting the AFEs (contrary to industry norms); Faulkner's lack of experience or education in the oil and gas industry; misuse and misappropriation of Breitling funds, particularly for personal use by Faulkner; and comingling of investor proceeds in Breitling accounts. The auditors identified in detail the "over-selling" of units in underlying oil and gas interests. Given Scheef & Stone's ongoing and pervasive contact with principals and personnel of the Breitling Entities, all of the above negative information either was discovered, or could have been and should have been discovered by Scheef & Stone in the exercise of reasonable diligence. In fact, in the exercise of reasonable diligence Scheef & Stone should have been aware of these matters long before the auditors came on the scene to conduct the audits.

40.     Moreover, Scheef & Stone attorneys became aware of multiple regulatory inquiries and investor claims throughout its representation of Breitling and ongoing involvement in the Breitling Entities' securities offerings.  In particular, Scheef & Stone attorneys interacted with the SEC on behalf of the Breitling Entities in 2011 and 2012. At minimum, these initial interactions with the SEC should have operated as red flags putting Scheef & Stone on inquiry notice with respect to the accuracy of the Breitling Entities' disclosures and the legitimacy of the offerings including, without limitation, the legality of the Breitling Entities' sales practices.

41.     In December 2012, Scheef & Stone became aware that the Breitling Entities were the subject of a broadscale SEC Enforcement inquiry regarding the ongoing Breitling securities offerings and sales practices. Indeed, on or about January 31, 2013, Scheef and Stone became aware that Breitling Entities were the subject of a Formal Order for Investigation when the SEC served extensive and comprehensive subpoenas on both BOG and BRC.  Indeed, the SEC subpoenas were directed to BOG and BRC *in care of Scheef & Stone at its address.*   Yet this

existential threat to the Breitling Entities' ongoing operation apparently occasioned no change in Scheef & Stone's participation in the Breitling Entities' offerings which proceeded -- with Scheef & Stone's pervasive involvement -- without further diligence or inquiry by Scheef & Stone.

42.     Having participated in face to face meetings with SEC staff over a period of years, Scheef & Stone was aware of the SEC's enforcement interest in the Breitling Entities' securities offerings.  After receiving the SEC subpoenas, Scheef & Stone assisted the Breitling Entities in responding to and producing documents responsive to said subpoenas, and Scheef & Stone thereby became aware of the subjects of the SEC's enforcement interests including, without limitation, documentation regarding Breitling's practices, solicitation of investors, and sales transaction-based compensation for Breitling's unlicensed sales personnel. Upon receipt of the January 31, 2013 subpoena, Scheef & Stone knew to a certainty that the SEC's informal inquiries had ripened into a formal investigation (which requires a showing of the factual bases for such an investigation).  In written communications with the SEC thereafter, Scheef & Stone lawyers were advised of the breadth of the SEC's investigation and became aware that the investigation was not limited to the activities of a single individual or individuals. The extensive request for documents embodied in the SEC subpoenas clearly put Scheef & Stone on notice with respect to all of the substantive issues which eventually gave rise to the SEC Enforcement Action.

43.     In or about the first quarter of 2013, Scheef & Stone was replaced as defense counsel in the SEC investigation by another law firm – Vinson & Elkins ("V&E").  Yet even after that change in representation, Scheef & Stone lawyers, through communications with lawyers at V&E, acquired additional knowledge of the substance of the SEC enforcement

investigation and the substantive issues which the SEC was raising regarding the various offerings in which Scheef & Stone had been instrumental.  Nevertheless, and notwithstanding their extensive knowledge of the emerging SEC Enforcement Action, Scheef & Stone lawyers continued to assist Breitling in its ongoing offering of securities to the public.

44.     Moreover, Scheef and Stone lawyers continued to represent the Breitling Entities in the defense of numerous investor claims and complaints, many of which echoed some of the same questions raised and allegations made by the SEC, and should have caused Scheef & Stone to engage in further inquiry or due diligence with respect to its ongoing representation of BOG and its affiliates, including, without limitation, BRC, BECC and Crude, and ultimately either withdraw from said representation or "report up" the alleged violations within the Breitling Entities.

45.     Of particular significance, Scheef & Stone was aware of or in the exercise of ordinary care should have been aware that the AFEs in Breitling's CIMs were grossly inflated (and in some cases inauthentic) and calculated to mislead potential investors to believe that the costs for developing the wells on a turnkey basis would be much greater than the costs actually incurred. Breitling's auditors reviewed the AFEs for eight prospects in which Breitling estimated that drilling and other costs would equal approximately $18 million. The actual costs for these projects were just under $5.4 million -- an inflation by Breitling of over 336%. By inflating these cost estimates, Faulkner was able to obtain additional funds from investors which he misappropriated to the tune of tens of millions of dollars.  Scheef & Stone was aware of allegations concerning the fraudulent nature of the AFEs because the AFEs were a focus of certain investor claims against the Breitling Entities that were handled by Scheef & Stone.   Yet

despite their knowledge of the allegations of fraud surrounding the AFEs, Scheef & Stone continued to prepare and pump out the CIMs that incorporated the fraudulent AFEs.

46.     Scheef & Stone should have known of additional issues concerning the AFEs. For example, Scheef & Stone knew or should have known that BOG prepared all of its AFEs internally notwithstanding the industry norm of having the operator of the well perform this task.[4]   Scheef & Stone also knew or should have known that Breitling, as a non-operator of the well, would lack information and control over drilling details and therefore the AFEs would be inherently inaccurate. And Scheef & Stone should have known that at least two AFEs included in Breitling offering documents were identical -- one simply having been copied from one CIM for a subsequent CIM.

47.     As set forth above, Scheef & Stone's multi-year representation of the Breitling Entities was bifurcated. Roger Crabb, one of the firm's partners, bore primary responsibility for preparation of the CIMs in support of the Reg D private placement securities offerings, as well as counseling the entities with respect to securities compliance issues -- particularly with regard to registration, licensure and sales practices/compensation issues.  Mitch Little, also a partner, handled various claims asserted against the Breitling Entities by investors arising from the private placements prepared by Crabb. These claims in varying amounts were, in some instances, similar in substance and -- it would later develop – very similar to the allegations the SEC made against the Breitling Entities under the anti-fraud provisions of the Federal securities laws.

48.     As set forth above, Scheef & Stone initially undertook to represent the Breitling Entities in the SEC's formal investigation without pausing or apparently even considering the

---

[4] Reasonable diligence by Scheef & Stone would have revealed that several oil and gas operators did in fact provide Faulkner with AFEs. In many instances, the AFEs attached to the Breitling CIMs were inflated by several multiples of the cost estimates provided by operators.

implications of the SEC's investigation concerning the ongoing securities offerings.    In fact, Breitling's private placement offerings -- with the material involvement and assistance of Scheef & Stone -- continued unabated through 2016 when the SEC's investigation ripened into an Enforcement Action alleging a massive and pervasive fraud.  Neither the civil investor claims handled by Scheef & Stone nor the pendency of the SEC's investigation were ever disclosed to investors in the CIMs, which were prepared and disseminated with the material assistance of Scheef & Stone, and there is no evidence that Scheef & Stone ever advised the Breitling Entities to make such disclosures.

49.    Scheef & Stone's negligent and tortious conduct in its representation of the Breitling Entities was a substantial factor in the perpetuation and growth of the Breitling fraud scheme. Scheef & Stone was duty-bound to either urge the Breitling Entities to cease committing fraud and violating securities laws or resign from its representation of the Breitling Entities once Scheef & Stone became aware of Breitling's fraudulent and illegal conduct.    At a minimum, once it was on notice of potentially fraudulent or illegal conduct by its client, Texas law is clear that Scheef & Stone had an ethical duty to investigate and should have initiated further inquiry with respect to the matters in question to ensure that it was not facilitating fraud or illegal acts. Scheef & Stone should have insisted that Breitling issue corrective disclosures in connection with further sales and/or that rescission be offered to defrauded investors. On the contrary, heedless of the substantial red flags cited above -- and with knowledge of the SEC's investigation and similar private investor claims -- Scheef & Stone continued to assist the Breitling Entities in ongoing offerings and the legal matters arising from them. In doing so, it put a stamp of approval on Breitling's operations, lending it a false aura of legitimacy and permitting

Breitling's fraudulent offerings to continue unabated for a period of years until the SEC, Department of Justice and Internal Revenue Service intervened.

50.     Defendants' tortious, negligent and grossly negligent actions (and inactions) paved the way for Faulkner's use of the Breitling Entities as vehicles for his fraud, thereby enabling Faulkner to misappropriate more than $32 million in Breitling assets, clouding and risking loss of title to oil and gas-related assets, and exposing Breitling to over $100 million in increased liabilities, including without limitation substantial liabilities to professionals (particularly, but not exclusively, with respect to the administration of the Receivership Estate) and other creditors. But for Defendants' acts and omissions, the scale of the overall Breitling fraudulent scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

51.     When Defendants turned a blind eye to the red flags they encountered during their representation, they breached the duties that they owed to their Breitling clients.  Aided by Defendants' negligence and/or intentional misconduct, Faulkner caused the Breitling Entities to fraudulently sell tens of millions of dollars' worth of securities to investors, with very little of these funds remaining in segregated accounts for use for authorized purposes, thereby exposing the Breitling Entities to massive liabilities.  Instead, Faulkner diverted and distributed substantial sums to himself for his own personal benefit and in support of his lavish lifestyle. Despite their knowledge of the red flags which would have tipped off an attorney of reasonable skill and competence to Faulkner's fraud and violations of securities laws, Defendants refused to lift the veil on the Breitling fraudulent scheme. If Defendants had exercised even a minimum level of the independence, inquiry, and professional skepticism required of them, then they would have demanded that the Breitling Entities augment their disclosures to investors and potential

investors which would have revealed Faulkner's fraudulent scheme many years earlier, saving Breitling tens of millions of dollars in losses and increased liabilities that would not otherwise have been incurred, including increased liabilities to professionals and other creditors.

## V.   STATUTE OF LIMITATIONS DEFENSES

### A.  Discovery Rule / Inquiry Notice / Equitable Tolling

52.    The Receiver was appointed in the Enforcement Action on August 14, 2017 with respect to "*oil-and-gas related* assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 108 at p. 1 (emphasis added). On September 25, 2017, the Receiver was appointed with respect to "*all* assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 142 at p. 1 (emphasis added). On September 12, 2018 the Court expanded the Receivership Estate to include Enforcement Action defendant Patriot and other Enforcement Action non-parties, including BRC. *See* Case No. 3:16-cv-01735-D, ECF No. 320 at p. 1. On March 26, 2019, the Court expanded the Receivership Estate to include Enforcement Action defendant Crude Energy and Enforcement Action non-party Crude Royalties. *See* Case No. 3:16-cv-01735-D, ECF No. 418 at p. 1.

53.    Pursuant to the Receivership Order, with respect to "a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action." ECF No. 108 at ¶22, ECF No. 142 at ¶34, ECF No. 320 at ¶34, ECF No. 418 at ¶34. On September 3, 2019 the Enforcement Action Court entered an Order Granting the Receiver's Motion for Leave to

Commence Ancillary Litigation (Case No. 3:16-cv-01735-D, ECF No. 478), stating that the provisions of Paragraph 34 of the Receivership Order tolling applicable statutes of limitation as to Defendants would remain in force for 60 days from the date of the Order. *Id*. at 2.

54.     Plaintiff did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, Defendants' negligence and participation in Faulkner's and others' breaches of fiduciary duties and the Breitling fraudulent scheme and the true nature of the injury suffered. Moreover, Defendants' wrongful acts were inherently undiscoverable. Plaintiff also asserts the doctrine of equitable tolling and adverse domination. Additionally, the Breitling Entities were not able to bring the causes of action asserted herein until they were "freed of [Faulkner's] coercion by the court's appointment of [the] [R]eceiver." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013).

## VI.     CAUSES OF ACTION

55.     For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

**COUNT I: Negligence/Gross Negligence**

56.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

57.     Defendants owed a duty to the Breitling Entities (including to Crude and Patriot) to exercise their professional responsibilities through the exercise of the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances. Defendants' negligent acts or omissions breached that duty to Breitling. Defendants' negligence and/or gross negligence proximately caused injury to Breitling by enabling Faulkner to continue his fraud, thereby misappropriating over $32 million from

Breitling, and by causing the Breitling Entities to suffer millions of dollars of additional losses, including millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. As a result of Defendants' breaches, Breitling suffered millions of dollars in damages. But for Defendants' acts and omissions, the scale and duration of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced. Defendants' conduct constituted gross negligence as that term is defined in TEX. CIV. P. & REM CODE § 41.001. Accordingly, Plaintiff is entitled to recover exemplary damages.

**COUNT II: Participation in Breach of Fiduciary Duties**

58.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

59.     Faulkner and the other directors and officers of the Breitling Entities, including but not limited to Hallam and Miller, owed fiduciary duties to the Breitling Entities.  They breached their fiduciary duties by causing BOG, BRC, BECC, Crude and Patriot to violate securities laws and engage in an illegal fraudulent scheme that enabled Faulkner to misappropriate millions of dollars from the Breitling Entities, causing these entities to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities.

60.     Defendants knowingly participated in these breaches of fiduciary duties. Defendants knew Faulkner owed fiduciary duties to these entities, and Defendants were aware that Faulkner was breaching his fiduciary duties by causing the entities to violate securities laws. Defendants also knew that they were aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein. Faulkner's, Hallam's and Miller's fiduciary breaches and Defendants' participation in these breaches enabled Faulkner to continue his fraud,

misappropriating over $32 million from Breitling, causing these companies to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. But for Defendants' acts and omissions, the scale of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

61.     Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in extraordinary harm to the Breitling Entities. Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

## COUNT III: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme

62.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

63.     By its conduct described herein, Defendants aided, abetted, and/or participated with Faulkner in the fraudulent scheme carried out by him through Breitling. In particular, Defendants' services assisted the fraudulent scheme that enabled Faulkner to fraudulently offer securities to public investors and misappropriate over $32 million from BOG, BRC, BECC, Crude and Patriot. Defendants' conduct caused these entities to suffer losses and caused these entities to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. As a result of this conduct, Defendants are directly liable for fraud, and their actions, in combination with the actions of Faulkner, are a proximate cause of actual damages to BOG, BRC, BECC, Crude and Patriot in the millions of dollars.

**COUNT IV: Avoidance of Fraudulent Transfers**

64.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

65.     Between December 1, 2013 and April 1, 2014, and at the direction of Faulkner, BOG and BECC made transfers totaling at least $331,637.48 to Scheef & Stone.

66.     Faulkner caused BOG and BECC to make these transfers with actual intent to hinder, delay, or defraud creditors of BOG and BECC. Scheef & Stone was engaged, and these transfers were made, at Faulkner's direction in furtherance of the fraudulent scheme alleged herein. Faulkner engaged Scheef & Stone in order to continue, and expand upon, his fraudulent scheme.

67.     Pursuant to the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE §24.001 *et seq.* ("TUFTA"), the Receiver may avoid these transfers from Breitling Entities to Scheef & Stone.

68.     Scheef & Stone cannot meet its burden of proof with respect to the TUFTA statutory affirmative defense (at § 24.009(a)). The good faith requirement of the TUFTA affirmative defense requires a transferee show objective, rather than subjective good faith -- *i.e.*, whether the transferee objectively "knew or should have known" of the fraudulent nature behind the transfers. *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Bankr. Tex. 2009). A transferee knew of the fraud if it had actual knowledge of the fraud. *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001). A transferee should have known of the fraud if it received a transfer with knowledge of facts that would excite the suspicions of a person of ordinary prudence and if diligence would lead to knowledge of the transferor's fraudulent intent. *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009); *see also Flores v. Robinson Roofing &*

*Constr. Co.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005) (defining good faith as lack of awareness of transferor's intent).

69.     Scheef & Stone had actual knowledge of, or but for its negligence and gross negligence, should have known of, Faulkner's fraudulent misrepresentations made in the Breitling offering documents, his misuse of investor proceeds, and his misappropriation of millions of dollars in Breitling funds.

70.     The Receiver is entitled to his costs and reasonable attorney's fees as are equitable and just, pursuant to TUFTA § 24.013.

## VII.    ACTUAL DAMAGES

71.     BOG, BRC, BECC, Crude and Patriot have suffered losses of tens of millions of dollars as a result of the diversion and misappropriation of millions of dollars from them by Faulkner, tens of millions of dollars of losses based on uses of investor proceeds at the direction of Faulkner that were contrary to representations made to investors regarding how their money would be invested, and tens of millions of dollars of increased liabilities owed by BOG, BRC, BECC, Crude and Patriot to creditors, including without limitation professional and administrative liabilities, all during Defendants' representation as attorneys for the Breitling Entities. These losses were proximately caused by Defendants' negligence and wrongful conduct. Additionally, the Receiver is entitled to the forfeiture of fees paid to Defendants (and other legal counsel engaged) as fraudulent transfers. The Receiver also is entitled to the recovery of its just and reasonable attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to the Receiver. The Receiver has retained the undersigned attorneys and has agreed to pay them a reasonable attorneys' fee for their work.

## VIII.   PUNITIVE DAMAGES

72.     The Receiver's injuries resulted from Defendants' gross negligence, malice, or actual fraud, which entitles the Receiver to exemplary damages in an amount necessary to punish Defendants, and to deter similar conduct by others in the future.

## IX.     CONDITIONS PRECEDENT

73.     All conditions precedent to filing this Complaint have been met.

## X.     JURY DEMAND

74.     The Receiver demands a trial by jury.

## XI.     PRAYER

75.     The Receiver requests that Defendants Scheef & Stone, Cobb and Little be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Receiver recover its damages as alleged herein, including its actual damages, punitive damages, and its costs and expenses of suit, including reasonable attorneys' fees. The Receiver prays for such other relief to which it may be justly entitled.

Dated: November 1, 2019                    Respectfully submitted,

                                           **CASTILLO SNYDER, P.C.**
                                           700 N. St. Mary's, Suite 1560
                                           San Antonio, Texas 78205
                                           Telephone:     210-630-4200
                                           Facsimile:     210-630-4210

                                           */s/ Edward C. Snyder*
                                           Edward C. Snyder
                                           Texas State Bar No. 791699
                                           esnyder@casnlaw.com
                                           Jesse R. Castillo
                                           Texas State Bar No. 03986600
                                           jcastillo@casnlaw.com

                                           ***ATTORNEYS    FOR    THOMAS    L.
                                           TAYLOR, III***