## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| THOMAS L. TAYLOR III, solely in his capacity as Court-appointed temporary receiver for Breitling Energy Corporation, *et al.*, <br>     Plaintiff, <br><br> v. <br><br> SCHEEF & STONE, LLP, ROGER CRABB, and MITCH LITTLE, <br>     Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIV. ACTION NO. 3:19-cv-02602-D |

### RECEIVER'S SECOND AMENDED COMPLAINT

**CASTILLO SNYDER, P.C.**

Edward C. Snyder
Texas State Bar No. 791699
esnyder@casnlaw.com
Jesse R. Castillo
Texas State Bar No. 03986600
jcastillo@casnlaw.com
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
Telephone:    210-630-4200
Facsimile:    210-630-4210

*ATTORNEYS FOR THOMAS L. TAYLOR, III*

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ......................................................................................... 1

II.  PARTIES .................................................................................................. 6

III. JURISDICTION & VENUE ...................................................................... 7

IV. FACTUAL BACKGROUND ...................................................................... 7

      A.  The Breitling Fraud………………………………………………………7

      B.  Defendants' Knowing, Reckless and/or Negligent Participation……………………..16

V.  STATUTE OF LIMITATIONS DEFENSES ......................................... 53

      A.  Discovery Rule/ Inquiry Notice/ Equitable Tolling…………………………………53

VI. CAUSES OF ACTION .............................................................................. 54

    COUNT I: Negligence/Gross Negligence ................................................ 54

    COUNT II: Participation in Breach of Fiduciary Duties ........................... 55

    COUNT III: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme............... 56

    COUNT IV: Avoidance of Fraudulent Transfers ................................... 57

VII.    ACTUAL DAMAGES............................................................................ 58

VIII.   PUNITIVE DAMAGES ......................................................................... 59

IX. CONDITIONS PRECEDENT ................................................................. 59

X.  JURY DEMAND ....................................................................................... 59

XI. PRAYER .................................................................................................... 59

Plaintiff Thomas L. Taylor III ("Plaintiff" or "Receiver"), solely in his capacity as temporary receiver appointed by orders entered in the civil action styled *Securities and Exchange Commission v. Christopher A. Faulkner, Breitling Energy Corporation, Jeremy S. Wagers, Judson F. ("Rick") Hoover, Parker R. Hallam, Joseph Simo, Dustin Michael Miller Rodriguez, Beth C. Handkins, Gilbert Steedley, Breitling Oil & Gas Corporation, Crude Energy, LLC, Patriot Energy, Inc., Defendants, and Tamra M. Freedman and Jetmir Ahmedi, Relief Defendants*; No. 3:16-cv-01735-D; in the United States District Court for the Northern District of Texas, Dallas Division ("Enforcement Action"), files this Second Amended Complaint ("Complaint") against Scheef & Stone, LLP, Roger Crabb ("Crabb") and Mitch Little ("Little") (collectively, "Scheef & Stone" or "Defendants"), and alleges the following:

## I.   <u>INTRODUCTION</u>

1.     The Receiver brings this action to recover damages sustained by Breitling Oil & Gas Corporation ("BOG"), Breitling Royalties Corporation ("BRC"), Breitling Energy Corporation ("BECC"), Crude Energy, LLC ("Crude Energy"), and Crude Royalties, LLC ("Crude Royalties") and Patriot Energy, Inc. ("Patriot") (collectively referred to hereinafter as the "Breitling Entities" or "Breitling") as a result of Defendants' intentional misconduct and failure to exercise the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances in conducting their legal representation of Breitling.

2.     Beginning in 2010 and continuing through 2016, Christopher A. Faulkner ("Faulkner") orchestrated a massive fraud using Breitling and other entities under his control to raise approximately $150 million in gross proceeds from investors through the offer and sale of oil and gas-related securities.  During this time, Faulkner (individually and through entities under

his control) misappropriated approximately $32.8 million in Breitling funds, both through the receipt of transfers from Breitling accounts (including under the color of expense reimbursements), and through the payment of personal expenses from Breitling bank and credit card accounts. From the inception of the fraud, Faulkner made use of Breitling's assets to fund a lavish lifestyle -- including multiple homes across the country, acquisition of luxury goods, and international travel and entertainment.

3.       Commencing in or about April 2010, and continuing through at least the end of 2015, Defendant Scheef & Stone acted as Breitling's primary outside securities counsel and as such performed various legal services on behalf of Breitling to (i) facilitate the offer and sale to investors of unregistered securities linked to oil and gas-related working interests and royalty interests and (ii) shield and protect Breitling from investor claims and regulatory scrutiny and to generally keep Breitling in business selling its illicit and illegal securities.

4.       Scheef & Stone acted as primary legal counsel for Breitling from 2010 through 2015 and was specifically retained to purportedly assist Breitling to comply with state and federal securities laws, but in reality Scheef & Stone's role devolved into helping shield Faulkner schemes from regulatory inquiries and investigations by multiple state securities regulatory agencies while also fending off and settling (with strict confidentiality provisions) numerous investor complaints of fraud.  Scheef & Stone lawyers were in constant, almost daily, contact with Faulkner and other Breitling executives from 2010 through 2014, and were fully aware that Faulkner was operating a securities sales "boiler room" operation and using unlicensed sales personnel – some with prior documented regulatory violations - to engage in "general solicitation" of investors via Breitling's Website, internet advertising, and via "cold calls" to investors, and Scheef & Stone actually set up the "bonus" compensation program to enable Brietling's unlicensed securities sales team to evade

securities laws restrictions on transaction-based compensation.  From 2010 through 2015 and based on the compensation structure established by Scheef & Stone, Faulkner caused Breitling to pay the Breitling securities sales team members millions of dollars (potentially as much as $10 million) in illegal securities sales commissions in violation of federal securities laws.

5.       All the while, and even in the face of a steady drum beat of state securities regulatory inquiries and "cease and desist" orders and almost non-stop investor claims of fraud against Breitling that began virtually from Day One of its representation of the Breitling Entities, Scheef & Stone continued to pump out project-specific Confidential Information Memoranda and Private Placement Memoranda (called confidential information memorandums or "CIMs"), investor Subscription Agreements, and other offering-related documents for dissemination to potential investors in connection with the sale of the securities.  Scheef & Stone was even eventually involved in the formal investigation of Breitling by the Securities and Exchange Commission ("SEC") which culminated in the SEC's Enforcement Action, and the firm's lawyers (primarily Defendant Little) continued to be updated by Faulkner and other lawyers about the scope and progress of the SEC investigation (and the allegations made therein) as it developed even after Scheef & Stone was replaced as counsel in that investigation.

6.       In addition to working on virtually all of the Breitling Entities' Reg D private placement offerings and counseling Breitling with respect to federal and state securities laws generally, Scheef & Stone attorneys also created the patently artificial "bonus" program which was employed to evade well known strictures on sales-based compensation.  It is now known that well in excess of $100 million in securities were sold by unlicensed Breitling salespersons who received millions of dollars (and potentially as much as $10 million) in sales commissions which they were not lawfully entitled to receive. And no Breitling Entity was ever licensed as a broker-

dealer.   As described below, Scheef & Stone knew, or but for its gross negligence or outright complicity in Faulkner's schemes, should have known that Breitling salespersons (other than company officers) were engaged in the unlicensed sale of securities and were receiving securities transaction-based compensation.   After years of BOG and BRC salespersons violating federal and state securities laws by offering and selling unregistered securities and receiving transaction-based sales commissions without a securities license, Scheef & Stone counseled Crude to implement the same or similar "bonus" program enabling Crude to continue the same illegal sales practices, evading compliance with securities laws by assigning bonuses purportedly based upon such pretextual criteria as attendance and sartorial proficiency.

7.     The Breitling Entities relied on Scheef & Stone to provide legal representation with the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances.   The innocent Breitling Entities were unaware that Faulkner was using them to violate securities laws – including through the payment of securities sales commissions to unlicensed securities sales representatives - and commit fraud, and would not have otherwise engaged in such conduct had Scheef & Stone provided the proper legal advice.[1] As detailed below, Defendants failed in their charge and breached their duties to the Breitling Entities by instead assisting the directors and officers of the Breitling Entities, including in particular Faulkner, to breach fiduciary duties they owed to the entities by directing and causing the entities to routinely violate securities laws and commit fraud on investors.

---

[1] *Janvey v. Democratic Sen. Campaign Comm., Inc.*, 712 F.3d 185, 190-92 (5th Cir. 2013) ("*DSCC*") (Stanford entities' actions were "coerced" by Allen Stanford who used them like "robotic tools" and "evil zombies")(citing *Scholes v. Lehman*, 56 F. 3d 750 (7th Cir. 1995); *Janvey v. Alguire*, 847 F. 3d 231, 241 (5th Cir. 2017) (same); *Jones v. Wells Fargo Bank*, 666 F.3d 955, 965- 967 (5th Cir. 2012) (corporation is entity separate from its individual bad actors).

8.     Defendants are liable to the Receivership Estate for damages caused by their breaches of duties owed to the Receivership Entities (1) with respect to their conduct in shielding Breitling from regulatory inquiries and investor fraud claims which allowed Faulkner to continue to exercise his adverse control over the Breitling Entities and thereby keep the Breitling Entities in business selling securities in violation of securities law;  (2) assisting and enabling the officers and directors of the innocent Breitling Entities to cause said entities to unwittingly violate securities laws through the sale of unregistered securities by unregistered dealers propelled by an illegal "bonus" compensation program that Scheef & Stone counseled and devised;  (3) assisting Faulkner with the preparation and dissemination of materially misleading CIMs and other offering-related documents, and hence, the implementation of fraudulent and unlawful securities offerings which damaged the Receivership Entities; and (4) for the rendition of defective securities compliance advice – including but not limited to advice regarding broker-dealer licensure and securities sales practices and compensation.  Importantly, the foregoing negligent or grossly negligent legal services were performed by Scheef & Stone, in part, while it was aware of -- but did not advise the Breitling Entities to disclose to investors -- the pendency of a major enforcement investigation by the SEC and numerous other regulatory inquiries and investor claims.  Moreover Scheef & Stone never advised the Breitling Entities to cease offering their unregistered securities despite the firm's knowledge that such offerings were "integrated" and therefore the firm knew or should have known that the Reg D exemption was "blown" by Breitling for all subsequent offerings when Scheef & Stone discovered that Breitling had engaged in general solicitation in 2011.  The innocent Breitling Entities otherwise didn't know that they were violating securities laws by selling unregistered securities.

9.       The innocent Breitling Entities were not aware that they were violating securities laws and would have followed and complied with applicable securities laws if Scheef & Stone had provided the proper legal advice.   Scheef & Stone's conduct also aided and abetted the Breitling Entity officers' and directors' breaches of fiduciary duties to the Breitling Entities which enabled said persons to manipulate and utilize the innocent Breitling Entities to carry out a massive fraud.

## II.       PARTIES

10.       Plaintiff Thomas L. Taylor III was appointed as temporary receiver pursuant to Orders entered in the Enforcement Action. *See* Enforcement Action, Case No. 3:16-cv-01735-D (N.D. Tex. 2016), ECF No. 108, as amended by ECF No. 142, as amended by ECF No. 320, as amended by ECF No. 418 (collectively referred to as the "Receivership Order").[2] Plaintiff currently serves as temporary receiver for the estates of Faulkner, BOG, BRC, BECC, Crude Energy, Crude Royalties (together, "Crude"), Patriot, Breitling Ventures Corporation, Breitling Holdings Corporation, Breitling Operating Corporation, Inwood Investments, Inc. and Grand Mesa Investments, Inc. (collectively, excluding Faulkner, the "Receivership Entities") (the "Receivership Estate"). Receivership Order at p. 1, at ¶2. Plaintiff has been appointed over the "Receivership Assets", *id*. at ¶2, which includes "all assets—in any form or of any kind whatsoever—owned, controlled, managed, or possessed by…, directly or indirectly," Faulkner and the Receivership Entities. *Id*. at p. 1. The Receiver asserts the causes of action herein on behalf of BOG, BRC, BECC, Crude and Patriot.

11.       Defendant Scheef & Stone, LLP was at all times relevant to this Complaint a Texas limited liability partnership with its principal place of business in Texas located at 500 North Akard

---

[2] Unless otherwise specified, citations to the Receivership Order refer to pages and paragraphs in Dkt. 418.

Street, Suite 2700, Dallas, Texas 75201. Scheef & Stone has been served and has filed responsive pleadings in this action.

12.     Defendant Crabb was at all times relevant to this Complaint an individual residing in Texas. At times relevant to this Complaint, Crabb was a partner of Scheef & Stone in Dallas, Texas. Crabb has been served and has filed responsive pleadings in this action.

13.     Defendant Little was at all times relevant to this Complaint an individual residing in Texas. At times relevant to this Complaint, Little was a partner of Scheef & Stone in Dallas, Texas. Little has been served and has filed responsive pleadings in this action.

## III.     JURISDICTION & VENUE

14.     This Court has jurisdiction over this action, and venue is proper, as the Court that appointed the Temporary Receiver, and under Section 22(a) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77v(a)), Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754). Venue in the Northern District of Texas is proper as at all times relevant to this Complaint because Scheef & Stone's principal place of business in Texas was located in the Northern District of Texas. Additionally, the vast majority of the wrongful conduct alleged herein with respect to Defendants occurred in the Northern District of Texas.

## IV.     FACTUAL BACKGROUND

### A.  The Breitling Fraud

15.     Enforcement Action defendants Faulkner, Parker Hallam ("Hallam") and Dusty Michael Miller Rodriguez ("Miller") founded the Breitling Entities BOG and BRC in 2009 and 2010, respectively. Using these entities -- and later BECC, Crude, and Patriot -- Faulkner orchestrated and implemented a nationwide, multi-million-dollar fraudulent scheme through the

offer and sale of oil and gas securities to investors. With Scheef & Stone's substantial assistance, Breitling solicited and received funds from investors regularly from approximately 2010 through at least February 2016.

16.    From the inception of BOG and BRC, Faulkner served as said entities' President and Chief Executive Officer, controlled their overall direction, and managed their day-to-day operations.  In such capacity he owed fiduciary duties to said entities.

17.    As devised by Faulkner, the main business activity of BOG and BRC was the management and syndication of oil and gas-related investments.  Faulkner used BOG to offer and sell securities (typically denominated as "Units") related to oil and gas working interests.  Faulkner used BRC to offer and sell securities (typically denominated as "Interests") related to oil and gas royalty interests. Potential investors in Faulkner's scheme were identified using lead lists, Google advertisements, radio advertising, and inquiries generated through visits to the Breitling Entities' website(s), Faulkner's speaking engagements at conferences and media appearances by Faulkner. BOG and BRC sales personnel also regularly contacted prospective investors using "cold calls". Such sales practices, of which Scheef & Stone was aware, constituted "general solicitation", nullifying Faulkner and Scheef & Stone's reliance on the Regulation D exemption to securities registration and thereby exposing the Breitling Entities to recission liability for violations of securities laws for the sale of unregistered securities.

18.    The terms of the BOG and BRC securities offerings were provided to investors through offering materials in the form of CIMs prepared (or reviewed and "blessed") by Scheef & Stone. The Breitling CIMs were replete with material misrepresentations and omissions of material facts.  Moreover, Faulkner caused BOG and BRC to illegally offer and sell these securities through persons who were neither registered with the SEC as brokers nor associated with registered broker-

dealers and who were illegally being paid sales commissions disguised as "bonuses" through a sham artifice set up by Scheef & Stone.   Between 2010 and 2015, the Breitling Entities paid as much as $10 million in illegal sales commissions to Breitling's sales personnel as a result of the "bonus" program established by Defendants.

19.     One of the principal elements of Faulkner's fraud scheme involved estimates of how much it would likely cost to drill and complete the wells contemplated in the working interest securities offerings, and consequently how much the investments would likely earn.   Faulkner received estimates for drilling and completion costs -- known as Authority for Expenditures ("AFEs") -- from the operators that actually drilled and completed oil and gas wells. Instead of including these actual operator AFEs in the CIMs, however, Faulkner took the operator AFEs and grossly inflated them (in some instances by as much as ten times the original AFE received from the operator) and then Faulkner included these fabricated, fraudulent and bloated AFEs in the CIM offering documents provided to investors.   Faulkner then tied the price of the units offered for investment to investors via the CIMs to his fabricated and fraudulently inflated AFEs and sold the investments on a lump sum or "turnkey" basis to investors.   Faulkner's fraudulent inflation of the Breitling AFEs was blatantly obvious, but Scheef & Stone negligently ignored and, in multiple instances, failed to even bother to review the inflated AFEs that Faulkner included in the BOG (and later Crude) offering materials – even when the fraudulent AFEs were directly challenged by Breitling investors who dealt with Defendants.   As a result of Scheef & Stone's inattention to this basic detail of the BOG and Crude offerings they prepared and provided to Faulkner, Faulkner was able to continue fabricating AFEs for inclusion in Breitling offering materials throughout the existence of his 5 year fraud scheme.

20.     Because BOG and Crude were entitled to retain the investor proceeds they raised in excess of the actual costs of drilling and completing any wells, Faulkner's gross inflation of the AFEs ensured that Faulkner would be able to pocket millions of dollars in inflated "profits" from unwitting investors -- from which Faulkner could fund his lavish lifestyle.

21.     Another principal component of Faulkner's fraud scheme involved the overselling of working interests and royalty interests, i.e., Faulkner caused the Breitling Entities to sell more working interest and royalty interests securities than the entities owned.  Faulkner regularly "over-sold" units in BOG and BRC (and later Crude) offerings. Rather than disclosing this fact to investors, however, Faulkner and his cohorts masked this overselling by transferring investors out of the oversold prospects and into different well prospects and advising the "oversold" investors that Breitling was exercising its contractual right to reassign investors to "comparable" prospects. But Faulkner's "transfer" of oversold investors to other well prospects was contrary to the terms of the CIMs and Subscription agreements, which only allowed transfers of investors to different wells based on "*additional geological information*"; there was no contractual right for Faulkner to transfer investors to different wells just because Faulkner and his sales team had fraudulently oversold a well prospect.  Moreover, Faulkner and his cohorts often placed investors in materially different substitute prospects in different states with different operators, providing materially different ownership interests than those bargained and paid for by the investors.

22.     Scheef & Stone became aware of this "overselling" practice through the endless stream of investor complaints that Scheef & Stone quietly settled for Breitling, and Scheef & Stone actually advised the Breitling Entities in 2013 and again in 2014 that they could legally transfer investors to different wells "at will" based on the language contained in the CIMs – and even advised Breitling that investors who challenged such transfers didn't "*have a leg to stand on since*

*the [CIM language] is so clear"*.  Former BOG and BRC Chief Operating Officer and, later, President of Crude Parker Hallam has recently testified that he relied on this legal advice from Scheef & Stone and believed that Scheef & Stone's position that Breitling could transfer "oversold" investors to different wells than the ones they originally invested in was legally "solid".[3]

23.     In furtherance of the fraudulent securities scheme, and without disclosure to investors, Faulkner also ordered that funds invested with BOG and BRC for specific well projects be transferred to Breitling's general operating account and extensively comingled. Although investor funds were generally received by Breitling in offering-specific bank accounts, and per the terms of the CIMs were to be maintained in the segregated bank accounts in order to be used to cover well-specific expenses, the funds were almost always transferred thereafter into Breitling's general "operating accounts" prior to the completion of drilling and other completion costs associated with the offering's respective well(s), and the funds were thereby comingled with the proceeds of investors in other distinct offerings. Funds transferred to these "operating accounts" included the excess of funds illicitly received by Breitling as a result of the grossly inflated AFEs, which defrauded investors believed would be used to fund the working interest prospects underlying the BOG offerings.

24.     Faulkner directed Breitling personnel to pay various business expenses, including well drilling and completion costs, from these comingled "operating accounts" - meaning that one investor's money from one well prospect was necessarily being spent on expenses for a different well offering in a type of Ponzi scheme.  Moreover, it was from these "operating accounts" that

---

[3]     Mr. Hallam also confirmed in his recent deposition that the "advice of counsel" defense he asserted in the Answer he filed in the related SEC Action was based on the legal advice and counsel he received from Scheef & Stone over the years.  SEC Action, Doc. 55 (Answer of Parker Hallam) at p. 32, ¶ 8.

Faulkner directed the payment of his credit card bills representing millions of dollars in charges for his personal expenses, and from which Faulkner was reimbursed for personal expenses which he claimed, without support, were made on behalf of Breitling.

25.     With respect to royalty interests offered by Breitling, pursuant to the CIMs prepared by Scheef & Stone the offering Breitling entity (BRC and later Crude Royalties) was to retain a portion of the royalty interests purchased for the pool of investors, typically 10%. However, the "over-selling" of royalty interests to investors impacted the BRC and/or Crude Royalties balance sheet because the conveyance of more than 100% of the royalty interest purchased by BRC and/or Crude Royalties  ultimately effectuated a transfer of the *entirety* of the minority interest retained by the said entities pursuant to the CIMs. In other words, if BRC was supposed to transfer 90% of the royalty interests it purchased with investor proceeds to investors *pro rata* and retain 10% for itself, but instead BRC transferred to investors 120% of the royalty interests it purchased with investor proceeds, it risked (beyond the fraud liabilities to investors) losing the 10% retained interest in those royalty interests – basically all of its revenue for that offering.

26.     In all of these instances, title to the royalty interests conveyed by the offering entity is now, at minimum, clouded vis-à-vis both Breitling's interest and the investors' interests. As a result of these title defects, (i) oil and gas operators have suspended royalty payments to investors and Breitling Entities under the Texas Natural Resources Code, Section 91.402(b); and (ii) these royalty interests are unmarketable for resale. In this regard, the assets of the Breitling Entities were materially affected -- potentially all of the carried interests they were to receive as revenue for the offerings are at risk.

27.     From 2011 through 2013, BOG and BRC raised approximately $81.5 million in gross proceeds from investors. During this period, Faulkner misappropriated over $15 million from company coffers.

28.     In or about 2013, Faulkner conceived to take BOG and BRC public through a "reverse merger" transaction. A reverse merger occurs when a private company merges into a shell company that is already publicly traded; the private company thereby becomes a public company. The transaction results in a single, publicly traded entity, the name of which is changed to that of the formerly private company, and which is controlled by the owners of the formerly private company.

29.     On or about December 9, 2013, BOG and BRC closed the reverse merger transaction through which they acquired the publicly-traded shell company Bering Exploration, Inc. ("Bering Exploration") and renamed it Breitling Energy Corporation (and changed its ticker symbol to BECC). BOG and BRC became the majority shareholders of BECC, owning 92.5% of BECC's common stock, and as the 1/3 each owners of BOG and BRC, Faulkner, Hallam, and Miller effectively became the real owners of BECC. Faulkner became the President and CEO of the public entity BECC.

30.     From December 9, 2013 through February 2016, the Breitling Entities raised (primarily through the Crude Entities as described below) approximately $68.5 million in additional gross proceeds from investors. During this period, Faulkner misappropriated at least $18.5 million from Breitling.

31.     Contemporaneously with the reverse merger, Faulkner created Crude Energy and Crude Royalties and installed BOG and BRC co-founders Hallam and Miller as the officers for said entities.    Faulkner thereafter transferred the securities sales and marketing activities

previously undertaken by BOG and BRC directly to Crude, including transferring the former BOG and BRC clients, investments, sales teams and other employees to Crude.    Crude thereafter undertook to market and promote new securities offerings to investors in the exact same manner as BOG and BRC had done previously - using the Internet, "leads", and cold calls.

32.    The true nature of the relationship between BECC and Crude (and later Patriot) was not disclosed to investors or in public filings with the SEC. BECC's public filings disclosed only that BECC and Crude executed an Administrative Services Agreement ("ASA") contemporaneous to the closing of the reverse merger.   The ASA gave the relationship between BECC and Crude an aura of legitimacy and helped make transactions between BECC and Crude appear arm's-length in nature. In truth, however, Crude (and later Patriot) were mere alter-egos of BECC, and their financials were actually consolidated with those of BECC.

33.    In or about March 2015, following a falling out with Hallam, Faulkner transferred the securities  sales and marketing responsibilities from Crude to a new entity called Patriot, with Miller installed as the primary officer for Patriot. The Patriot entity simply continued Crude's securities sales operations under a new name. Faulkner opened new bank accounts in order to intercept incoming checks intended for investments in Crude's offerings and directed Miller (also an officer of Crude) to assign all of Crude's oil-and-gas working interests to Patriot.  In or about April 2015, BECC executed an ASA with Patriot containing materially equivalent terms to the ASA between BECC and Crude and disclosed it in a public filing.

34.    The offering activities of Crude and Patriot mirrored the offering activities of BOG and BRC. Crude and Patriot continued to deliver materially misleading offering documents, including the CIMs, to potential investors, which omitted Faulkner's and BECC's true relationship with Crude and Patriot and omitted the existence of the SEC's formal order investigation of

Breitling and all of the other state regulatory inquiries and investor claims of fraud being handled by Scheef & Stone. The AFEs contained in the Crude and Patriot CIMs continued to be fraudulent and grossly inflated without any reasonable basis. Investor funds obtained from the Crude and Patriot offerings were not only comingled in "operating accounts" but outright transferred to a purportedly independent, arms-length company (BECC) and used to pay millions of dollars for Faulkner's BECC American Express bills, including his personal expenses.

35.    Additionally, BECC actually consolidated Crude's (and later Patriot's) results of operations in its general ledger, a fact never disclosed to the public in BECC's filings or to investors in Crude's offerings. In this regard, Crude cash balances often represented the majority of the funds reported by BECC as its cash balances in filings with the SEC.

36.    As detailed below, Defendants knew of Crude's/Patriot's inextricably intertwined connection to Faulkner and the Breitling Entities, and knew that the Crude Entities had just replaced BOG and BRC as the working interest and royalty interest securities offering entities. Scheef and Stone continued to prepare CIMs for offerings by Crude, which were essentially a continuation of the offerings that they had done for BOG and BRC.  As it had done for BOG and BRC, Scheef and Stone also counseled Crude to conceal securities transaction-based commission compensation to non-registered individuals through use of the same fraudulent "bonus" system pursuant to which the sales personnel were compensated in huge amounts for, essentially, showing up on time.

37.    Because of Defendants' numerous failures in breach of their duties to the Breitling Entities, Faulkner was able to raise money from investors through Breitling's unregistered securities offerings and thereby continue his fraudulent scheme for years, funding his life of luxury upon millions of dollars of misappropriated Breitling assets.  As a result, Breitling liabilities

increased by tens of millions of dollars with respect to more than one thousand innocent investors, and by millions of dollars with respect to the professionals that Breitling eventually had to engage -- including without limitation attorneys and other professionals engaged to defend Breitling in the SEC's investigation and Enforcement Action and by the Receiver in his administration of the Receivership Estate to date.

### B.  Defendants' Knowing, Reckless and/or Negligent Participation

38.     Commencing in or about April 2010, and continuing through at least the end of 2015, Scheef & Stone represented the Breitling Entities as their primary outside counsel in relation to the offer and sale to investors of securities linked to oil and gas-related working interests and royalty interests.    Scheef & Stone's representation began in April 2010, when Faulkner received a letter from the Texas State Securities Board ("TSSB") dated April 7, 2010 questioning BOG's securities offerings and requesting documentation, including a list of investors, BOG's offering documents and BOG's corporate records.  At that time BOG had been in business for less than a year.  Little knew that Faulkner himself was barely transitioning out of his prior business endeavors in computer cloud hosting services (with companies Cassiopeia Internet Inc. and Constellate, which Faulkner had abandoned in January 2010 just prior to launching Breitling) and had little to no experience in the oil and gas industry.[4]

39.     On April 21, 2010 BOG retained Scheef & Stone to respond to the TSSB letter, and to provide legal representation to Breitling with regard to:

- Review of Regulation D, Rule 506 oil and gas securities offerings;

- Blue Sky Compliance; and

---

[4]        In 2011, Little assisted Faulkner in an ugly dispute with his former business partners at Cassiopeia/ Constellate.

- General securities-related advice.

40. Thereafter, Scheef & Stone served as the Breitling Entities' primary outside securities regulatory counsel. Scheef & Stone partner Mitch Little ("Little") was primarily responsible for handling state and federal regulatory inquiries and investigations and investor complaints and lawsuits, while partner Roger ("Rocky") Crabb ("Crabb") handled Breitling's securities offering documents, including the CIMs, PPMs and Subscription documents, and Crabb also oversaw Breitling's Reg D regulatory filings. Little and Crabb's primary points of contact at Breitling during this representation were Faulkner, Faulkner's "right hand" Beth Handkins ("Handkins") and, later, Jeremy Wagers ("Wagers") after Wagers was brought in as General Counsel for Breitling in late 2012.

41. Immediately upon being retained, on April 21, 2010 Little responded to the TSSB inquiry by informing said agency that BOG's offerings were not securities, and even if they were securities they were exempt from registration under Reg D and equivalent state securities law provisions. Little also informed the TSSB that BOG would be converting its offerings from joint ventures to direct participation working interests and that Scheef & Stone would be preparing BOG's "disclosure regime and Blue Sky compliance".

42. By November 2010, Crabb was working on the offering documents for a new offering for BOG – the Woodring #1 offering. As part of his preparation of the CIM/PPM for Woodring, Faulkner sent Crabb the AFE from the operator, showing a total well cost of $1,238,895.00. On November 12, 2010 Faulkner sent Crabb the "Geo report" from Joe Simo. Crabb finalized and e-mailed Faulkner the CIM and Subscription documents for the Woodring #1 offering on November 24, 2010, which CIM incorporated as Exhibits an AFE for $1,319,700 and a Geological Summary from SimoEnergy LLC in Plano, Texas.

43.      Almost immediately after the Woodring #1 offering, the SEC contacted Breitling to inquire about its use of its Website to attract investors.  Given Faulkner's past business history in Internet marketing and Web-hosting, it is readily apparent (and was apparent to Scheef & Stone) that Faulkner's business model for Breitling was to use the Internet as the primary marketing vehicle for Breitling's securities offerings.

44.      In January 2011 Little became aware that Faulkner was promoting Breitling's oil and gas offerings on Breitling's Website as "virtually risk free", and that Faulkner was using Google search engines to advertise Breitling offerings on the Internet.  Faulkner even provided Little with Google "click" report for Breitling showing 32,702 "clicks" over a roughly 6 month period.

45.      As part of the SEC's January 2011 inquiry, the SEC requested copies of Breitling's offering documents, and so in February 2011 Little reviewed Breitling's CIMs prior to authorizing Faulkner to turn them over to the SEC.  Faulkner asked Little if he should be more concerned with the TSSB or the SEC in terms of registering Breitling's sales staff as "finders".   Little responded that to his knowledge the SEC had never taken action against "finders".   On February 9, 2011 Faulkner responded and explained to Little how Breitling's unlicensed sales staff solicited investors and earned a "bonus" if the investor made an investment with Breitling.   Little advised Faulkner that Breitling could not characterize the bonuses as sales commissions (which they were) but that Breitling could structure the "bonuses" to be based on factors such as "attitude", "attendance", "enthusiasm" and "initiative".   The Breitling Entities were unaware that Scheef & Stone's legal advice on the securities sales compensation structure was improper and negligent and would cause the Breitling Entities to violate securities laws.  Had the Breitling Entities been provided with proper compliance advice on this issue, they would have followed such advice

because the innocent Breitling Entities had no intention to violate securities laws but were manipulated into doing so by Faulkner, aided by Scheef & Stone's counsel.  This legal advice set the stage for Breitling's illegal securities transaction-based compensation structure going forward, resulting in Breitling's payment of roughly $10 million in illegal securities sales commissions between 2010 and 2015 as well as propelling the explosion in unregistered securities sales by Breitling thereafter.

46.     Just a few weeks later in 2011, Faulkner notified Little that there was a group of Breitling investors "stirring up" trouble and threatening to go to the TSSB to complain about Breitling.   Little asked to see Breitling's investor roster, including any non-accredited investors. Faulkner responded that all of BOG's investors were accredited, to which Little replied "*that's not what Beth [Handkins] told me*".

47.     In March 2011, Little introduced Faulkner to Scheef & Stone lawyer Sarah Benes as the lawyer who would be responsible for BOG and BRC's Blue Sky compliance going forward. As part of that work, Little and Benes separately requested that Faulkner provide Scheef & Stone with the offering documents provided to investors for each offering, as well as the signed Subscription agreements for all BOG and BRC investors and the entities' existing Form D filings with the SEC.   From that point forward, Faulkner's right hand, Handkins, began regularly providing Scheef & Stone with Breitling's "Daily Blotters" listing investors in each of the BOG and BRC offerings, including the amounts of their individual investments.

48.     After reviewing BOG and BRC's Reg D filings, Scheef & Stone recommended amending them, and proceeded to file amended Form Ds for both BOG and BRC with the SEC in April 2011.  The BOG Form D listed 28 investors that had invested a total of $556,192 in BOG issued "mineral property securities" as of that date.  It further misrepresented to the SEC that BOG

paid $0 in sales commissions and $0 in Finders Fees.[5]  The BRC Form D listed 15 investors that had invested a total of $1,128,014 in BRC issued "mineral property securities" as of that date.  It further misrepresented to the SEC that BRC paid $0 in sales commissions and $0 in Finders Fees.

49.     Later in early June 2011, when Faulkner expressed concern about why Scheef & Stone wasn't filing a separate Form D for each of Breitling's offerings, Crabb and Benes explained that "because of the SEC's integration rules", each of the offerings by BOG and by BRC would be "integrated" as long as they were made within 6 months of each other, and that as a result Breitling did not have to make separate filings for each well offering.   Crabb offered that this "integration" of Breitling's Reg D offerings would "save you time and money".

50.     On March 14, 2011 Faulkner sent Little the existing "independent contractor" agreement Breitling was using with its sales personnel.   The agreement made clear that Breitling provided its "contractor" sales force with "investor relations tools", "investor information" and "investor relationship training".   Little sent the Breitling contractor agreement to his Scheef & Stone employment law partner Mark Simon, whose only comment was that, as drafted, the contractor agreement would create an employer/employee relationship.

51.     Simon created and provided to Faulkner in April 2011 a new Independent Contractor agreement for BOG to use with its sales personnel, but left the services and compensation sections blank for Little to draft.   Little produced his drafts of those sections to Faulkner on May 4, 2011.  As drafted by Little, the services section provided that BOG's sales force would (1) confirm accredited investor status of prospective investors;  (2) qualify suitability of BOG securities for the investors; (3) interact with the investors and (4) create and manage the

---

[5]     As discussed below, less than 2 years later in 2013 Little produced BOG and BRC income statements to the SEC that showed that roughly ½ of BOG and BRC's revenues were eaten up by "lead generation and advertising expenses".

relationships between BOG and prospective investors.   The compensation section that Little drafted provided that BOG could give bonuses to its sales force based on factors such as their "professionalism", "demeanor", "productivity", and "promptness".   The Breitling Entities thereafter used Scheef & Stone's Independent Contractor agreement to retain its "boiler room" sales force and pay them transaction-based "bonuses" (commissions) until the SEC shut down Breitling in 2016.

52.     In the meantime, Crabb continued to crank out CIMs for Breitling's securities offerings.   Typically, and based on the first CIM Crabb had created for BOG for the Woodring #1 offering, Faulkner or his staff would create a first draft of the CIM and Subscription documents and then forward it to Crabb for his review and "blessing".   Eager to please, Crabb would typically turn the CIMs around in less than 1 business day.  For example, on May 2, 2011 Faulkner e-mailed Crabb the draft CIM and Subscription packet for BOG's "Big Tex" offering at 3:00 pm.   Crabb reviewed, "blessed" and returned the offering documents to Faulkner – in clean and relined form - at 9:29 am the very next day.   Breitling's Handkins later sent Scheef & Stone's Sarah Benes the Daily Blotter for the Big Tex offering, revealing that in just two weeks since Crabb "blessed" the Big Tex CIM, four investors had already invested $192,500 in that offering.

53.     Crabb continued to work on Breitling's various securities offering CIMs.  On June 16, 2011 Crabb wrote to Faulkner that for all future Breitling CIMs he was going to add language that would make it difficult or impossible for investors to have their interests redeemed by the Breitling Entities.  In August 2011 he revised and "blessed" Breitling's new CIM for the Golden Ridge wells.  In soliciting Crabb's assistance on this new CIM, Faulkner told Crabb he needed it back ASAP "*so we can start selling*", so Crabb produced the revised CIM later that same day.

54.     By August 2011, Little began working on the first of what would become a steady stream of investor complaints against Breitling, this one alleging that Breitling had given the investor (Investor #1) a "net revenue interest" ("NRI") in a well that was different than what had been represented to him. Handkins explained to Little that Investor #1 had been "carried" from a different well, but Little still expressed doubts yet never took any action pursuant to Texas Disciplinary Rules 1.02 and 1.12[6] to investigate further to ensure that Breitling or its officers and

---

[6]       Texas Disciplinary Rule 1.02 provides in relevant part:

(c) A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent. A lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel and represent a client in connection with the making of a good faith effort to determine the validity, scope, meaning or application of the law.

(d) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in substantial injury to the financial interests or property of another, the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud.

(e) When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action.

Texas Disciplinary Rule 1.12 provides in relevant part:

(b) A lawyer representing an organization must take reasonable remedial actions whenever the lawyer learns or knows that:

(1) an officer, employee, or other person associated with the organization has committed or intends to commit a violation of a legal obligation to the organization or a violation of law which reasonably might be imputed to the organization;

(2) the violation is likely to result in substantial injury to the organization; an

(3) the violation is related to a matter within the scope of the lawyers representation of the organization.

(c) Except where prior disclosure to persons outside the organization is required by law or other Rules, a lawyer shall first attempt to resolve a violation by taking measures within the organization. In determining the internal procedures, actions or measures that are reasonably necessary in order to comply with paragraphs (a) and (b), a lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyers representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and

---

directors were not engaging in illegal acts or committing fraud and instead Little continued to represent Breitling for several more years.[7]

55.     Breitling and Little's response to such investor claims was invariably to offer "rescission" to the investor – a reimbursement of the investment – coupled with a strong confidentiality or non-disclosure agreement to keep the investor quiet.   As Little described it with respect to this first investor rescission claim he settled for Breitling, the settlement agreements were designed to "**keep [the investor's] mouth shut**".

56.     In September 2011, Faulkner and Handkins asked Little to represent BOG and BRC with a Cease and Desist proceeding initiated by the Pennsylvania Securities Commission alleging that the Breitling Entities were selling unregistered securities in Pennsylvania by soliciting investors through its Website and then having its sale staff call prospective investors to make securities offerings over the phone to non-accredited investors.     Little advised Faulkner and Handkins that Breitling's use of its Website to advertise Breitling's offerings and to qualify and

---

any other relevant considerations. Such procedures, actions and measures may include, but are not limited to, the following:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

(e) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing or when explanation appears reasonably necessary to avoid misunderstanding on their part.

[7]     Little could never get a clear answer from Breitling as to why Investor #1's interest appeared as a different percentage in different Breitling statements.   In an October 12, 2011 e-mail to Faulkner and Handkins, Little questioned how Investor #1's interest had increased over **6 times** between statements, and told Faulkner that **"[i]f the numbers are wrong for him , they're probably wrong for other people, and that's liable to blow up in your face big time"**.

"hook" investors did *not* constitute general solicitation.    Crabb followed up in October by providing Faulkner with a step-by-step "Process Overview" Memo for Breitling's sales force to follow in soliciting investors, with the first step being to "*provide educational and informational resources to prospective investors*", and also provided a separate brief Memo on the "Sale of Securities"/ A Refresher".

57.    A few days later, Faulkner asked Little for a brief and *"canned"* explanation of a pending lawsuit against Brietling by a well operator (Timberwolf) so Faulkner could provide it to the "***guys that sell for us***" so the lawsuit wouldn't "*appear too bad or negative*".   Little provided Faulkner with the "canned" explanation.

58.    On October 18, 2011, Faulkner informed Crabb that Breitling's "new lead form" was up on Breitling's Website by forwarding a website "contact form" through which a prospective investor who expressed interest in investing with Breitling could fill out an accredited investor form on the Breitling Website.  Crabb responded that he was "*glad to see*" that Faulkner had added the accredited investor "portal" to the website and suggested some minor changes to the accreditation form.   Faulkner e-mailed Crabb two days later that Breitling had also implemented a "*new process to phone qualify*" investors and told Crabb to "*spare no expense to defeat*" the Pennsylvania Securities Commission complaint "*or agree to terms that are not public*".  Faulkner followed up on October 25, 2011 with an e-mail to Crabb that "[*l]et's find a quiet way out of it…[j]ust don't want it public"*.

59.    On that same day, Faulkner sent a new investor complaint to Little, telling Little *"[n]eed to get this guy handled asap…same deal as [Investor #1]"*.   That investor, Investor #2, later e-mailed Little directly, informing him that he was a "young investor" who had obtained Breitling's information through a Google Ad, after which he had been sold an investment by a

Breitling sales representative over the phone.  Investor #2 further told Little that the Breitling sales representative had represented to him that each of Breitling's wells had a 90% success rate and that he would likely get his principal investment back in 8-12 months.

60.     The gravity of Investor #2's accusations caused Little to e-mail Faulkner on November 2, 2011 that ***"[i]f this story is accurate, you've got to get control of your sales guys. That's out of control.   To the point where we cannot continue to represent you if it can't get corrected."[8]***   Yet despite Little's bluster, Scheef & Stone continued to represent Breitling for five more years despite an ever-growing number of investor and regulator claims of fraud and securities law violations.

61.     Crabb continued to represent the Breitling Entities with respect to the Pennsylvania Securities Commission proceeding, and informed Faulkner in late October 2011 that the Pennsylvania regulators were very concerned that 3 separate Breitling employees made a securities offering over the phone to the same non-accredited, unqualified "first time" investor without conducting a "suitability" evaluation.   As part of his representation of Breitling in this matter, Crabb prepared and sent a letter to the Pennsylvania regulators in which, as part of an offer of settlement, he represented that neither BOG nor BRC had "*ever been involved in a lawsuit or had to return investor's funds*", despite the fact that Crabb's partner Little was at that very moment in the process of returning funds to two investors.

62.     Despite Crabb's efforts to resolve the Pennsylvania Securities Commission proceeding quietly, the Pennsylvania regulators insisted that any settlement and the original Cease

---

[8]     Amazingly, Faulkner responded to Little's e-mail by pointing out that Breitling should be "the least of [Little]'s problems" given some of the other clients Little represented, to which Little responded:  ***"You have more heat on you than any of those guys right now."***   Little also told Faulkner ***"don't tell me [the Breitling sales representative] isn't doing it, because he has a history of doing it."***   Upon information and belief that sales rep was "Dusty" Michael Miller, who had worked for other oil and gas securities issuers that Little had represented in the past.

and Desist Order against Breitling would continue in the public record.   Faulkner balked at that.
On November 10, 2011 Crabb pointed out to Faulkner that under the Texas Securities Act the
Breitling Entities could lose the exemption from registration of their securities if they were the
subjects of any enforcement order or judgment issued by another state's securities regulator.   A
week later Crabb informed Faulkner that he and Little had concluded that Breitling would need to
fight and proceed to a hearing with the Pennsylvania Securities Commission because the
Commission had indicated that it would need to issue a Press Release if any settlement with
Breitling were reached.   Crabb told Faulkner he had a "*very real concern that the 'reputational
damage' to your companies which we've been working so hard to avoid*" would occur in spite of
the settlement.    Scheef & Stone proceeded to retain local Pennsylvania counsel to represent
Breitling on the matter.

63.    By the end of November, 2011, Little realized that Faulkner had dropped the ball
on the settlement he had achieved with Breitling investor Investor #2, and that investor was now
accusing Breitling of violating securities laws prohibiting "general solicitation" and threatening to
file a complaint with the regulators in Texas unless Breitling refunded all of his money.   Faulkner
asked Little what they should do.    Little's advice to Faulkner was **"*Rescind him.   Get
confidentiality.   He hasn't figured out the <u>real</u> problem*."**

64.    The very next day, Faulkner notified Little that yet *another* investor [Investor #3]
was threatening to go to the SEC if Breitling didn't return his money.   Faulkner's instructions
were to rescind that investor as well.    In the meantime, Crabb continued to pump out CIMs and
offering documents for Breitling, including for the "Big Caesar" well at the end of December 2011.

65.    In early January 2012, Little learned that Faulkner had breached the settlement
agreement Little had worked out with Investor #1 by not making payments as required.  A week

later, Little discovered that one of the three Breitling unlicensed sales representatives who was the subject of the Pennsylvania proceeding, Al Teran, had a pre-existing Cease and Desist Order from the Kansas securities Commissioner prohibiting him from selling securities in that state. Breitling's Pennsylvania counsel reported to Faulkner, Little and Crabb that the Pennsylvania regulators were considering charging BOG for operating as an unlicensed broker-dealer.    Faulkner told the lawyers to settle the case and "*just get it done*".    As for the Press Release that the Pennsylvania regulators would release upon settlement, Faulkner told Little and Crabb that as long as they could postpone the timing of the settlement, he would be able to "*overpower it with positive press and bury it*".

66.    In late January 2012 Faulkner sent Little a 30 second promo spot he was going to run on the radio promoting Breitling.  Faulkner proceeded to run the radio spot and within a week sent an e-mail to Little that a prospective investor had already called expressing an interest in investing with Breitling.   Little responded with a reminder that Breitling shouldn't engage in "general solicitation" of investors, which he defined as "no discussion of individual offerings".

67.    On March 29, 2012 Little forwarded to Faulkner a news article about the then-proposed JOBS Act entitled "**JOBS Act Benefits Financial Criminals**" and told Faulkner "*[l]ooks like I'm going to be busy with scams*".  Faulkner responded that he was concerned that now "*everyone will be doing it*".   Little replied "*Let's see.  It's a tough business to last in*", to which Faulkner responded: "***Indeed.  But now everyone can do what we are already doing***."

68.    On May 1, 2012 Faulkner sent Crabb the deal specifications and draft CIM for a new securities offering called "Goodbird".  The next day he told Crabb that he wanted the CIM to be clear that "*at no time is Breitling required to return any portion of funds*" from investors.  Crabb

responded that he would make sure to include such language in the CIM.   Crabb revised and produced the final version of the Goodbird CIM to Faulkner on May 7, 2012.

69.     In June 2012 the Arkansas Securities Department sent a letter to Breitling requesting documentation, which led Faulkner to discover that Scheef & Stone lawyer Sarah Benes, who had been in charge of the Reg D Blue Sky filings for Breitling, had dropped the ball and neglected to file a Form D in Arkansas.   Faulkner was incensed as he discovered that Blue Sky filings had not been done in other states Breitling was selling in as well.   Crabb stepped in to take over the Blue Sky filings for Breitling.

70.     In August 2012, Faulkner forwarded to Little an e-mail describing a dispute brewing between Breitling and the operator on the Woodring well, Crown Energy.   Crown alleged that Breitling was several months behind in payments for monthly lease operating expenses and hadn't paid the "*majority of the Woodring AFE expenses as authorized by Breitling*".   Crown threatened that if Breitling didn't make payment of at least 50% of the outstanding amounts owed, Crown would have no choice but to shut-in the Woodring well.   Thus, by August 2012, Scheef & Stone knew that not only were investors and regulators raising questions about Breitling, but so were well operators.

71.     Just a few days later, on August 14, 2012 Handkins informed Little of a new investor complaint arising from the Big Tex and Golden Ridge offerings and told Little that Breitling would be returning funds to the investor (Investor #4) as well.  Faulkner followed up to tell Little to "*use same agreement as last client*".

72.     But before Little could settle Investor #4's claim, the investor retained counsel who sent a letter to Breitling dated October 8, 2012 alleging that Breitling's CIMs (drafted by Crabb) for the Woodring, Big Tex, Buffalo Run and Golden Ridge prospect offerings were replete with

material misrepresentations and therefore fraudulent.  In particular, Investor #4's counsel pointed out that the AFEs represented in the CIMs for each of the offerings "*were grossly overstated*" and "*completely fabricated*" by Breitling.   Investor #4 demanded rescission of his entire investment in all of the Breitling offerings.

73.    Faulkner told Little to settle Investor #4's claims, and as part of Little's e-mail correspondence with Investor #4's lawyer, the lawyer provided Little with the actual AFE for the Buffalo Run offering and noted that the "*amounts disclosed in the [CIM] have no relationship to the actual AFEs for the well*".   Taking his cue from Faulkner, Little responded that because the offerings were "turnkey", Breitling had "buffered" the AFEs to include a "promotional cost" to protect Breitling in the event of cost overruns.   Investor #4's lawyer replied by asking whether it was "*your client's position that the difference between the [actual] $7,194,000 AFE…provided by [the operator] and the $41,900,000 AFE provided by Breitling [in its CIM] can be explained by virtue of the promotional fees assessed by Breitling*?"    Little sent this e-mail to Faulkner, who told him to "*keep toting the line*", and so Little continued to do so.   Then on October 22, 2012, and <u>for the first time</u>, Little told Faulkner and Handkins that "*[Investor #4's] lawyer raises an important point…[y]ou guys need to be disclosing the actual AFEs.   If you want to mark it up, that's fine, but you need*" to disclose the actual AFE.   Faulkner continued to press Little to push back on Investor #4's lawyer and settle his claims at a 50% discount.   With still no settlement by November 1st, Faulkner instructed Little to "*keep the dialogue going…it's imperative*!".

74.    On October 31, 2012, Faulkner advised Little of a phone message he had received from the SEC questioning Breitling's use of its Website to promote its oil and gas offerings.   Little advised Faulkner and Handkins that "[*w*]*e just need to strike a balance between Chris' promotional energy and the SEC's scrutiny of the site*".

75.     The next day Handkins sent Little documents Breitling had received from an investor in Florida advising Breitling that one of its sales representatives, Brian Anderson, who was listed on Breitling's Website as a Vice President of Sales, had been banned for life from selling securities or insurance in Florida.   The letter went on to describe how Anderson had recently approached several senior citizens, none of whom were accredited investors, about investing in Breitling, including urging one to surrender her life savings held in an annuity in order to invest in Breitling offerings. The next day Little learned that another Breitling investor had been solicited by Anderson in violation of a "cease and desist" order from Vanguard Annuity.

76.     On November 7, 2012, Handkins forwarded to Little a letter Breitling received from the South Dakota Division of Securities accusing Breitling of engaging in "general solicitation" for the sale of oil and gas securities via Breitling's Website and via online advertising, and asking for the production of any and all marketing materials Breitling used for the Pumpkin Ridge offering.   Amazingly, Little responded that he needed more information from Breitling about how it was advertising - despite his knowledge that Breitling had been advertising on its Website and via Google Ads and radio spots virtually since the first day Scheef & Stone began representing Breitling (as Faulkner reminded Little in a November 15, 2012 e-mail).

77.     On November 14-15, 2012, Little e-mailed Faulkner that Breitling was being "double teamed" by the SEC and South Dakota regulators, but that "[*w*]*e can beat it*".   He advised Faulkner that the JOBS Act prevented the SEC from regulating "general solicitation" since the SEC had failed to implement regulations in compliance with the new law, and that therefore "*[t]he tiger has no teeth*".   Little proceeded to send an e-mail to the South Dakota regulator on November 16, 2012 arguing that Breitling was not engaged in general solicitation, and that the NSMIA and the JOBS Act preempted South Dakota's attempt to regulate Breitling's offerings and general

solicitation.   The innocent Breitling Entities relied on Little's advice and continued to engage in general solicitation to sell unregistered securities.

78.      At the same time in mid-November 2012, Little continued to try to resolve Investor #4's fraud claims but he couldn't get accurate information about the wells in dispute from Breitling.  Little raised that problem with Faulkner and told Faulkner that it worried him "*but we'll get through it*."  Faulkner responded by asking Little to send Crabb to give a "refresher" course on sales practices to Breitling's sales staff since the business was "*growing fast*".   On November 20, 2012, and at Little's request, Handkins sent Little a listing of the Google AdWords Breitling had been using to market and promote its offerings.   Little advised Faulkner that the listings were "*way too aggressive*" and "[*v*]*ery dangerous to you, as it would be easy to prove how the projects were marketed if they don't turn out as expected*".

79.       In late November 2012, Faulkner and Handkins informed Crabb of yet another investor in the Woodring project [Investor #5] that was demanding rescission and asked Crabb to draft the necessary documents "*before it escalates*".

80.      Then in mid-December 2012 Little received a document request from the SEC directed to the Breitling Entities.  At the request of Breitling's newly-hired General Counsel Jeremy Wagers ("Wagers"), Little asked the SEC the basis for the document request, and whether it was solely related to Breitling sales representative Brian Anderson.   The SEC responded that it was interested in matters beyond just Anderson.   In follow-up e-mails with Faulkner, Faulkner insisted to Little that he was "not comfortable" turning over Breitling's bank records to the SEC, and Little told Faulkner that he would not need to do so, and that the SEC was just "fishing".

Little suggested that the Breitling Entities just produce to the SEC the offering documents, lists of employees and balance sheets and profit/loss statements for BOG and BRC.[9]

81.     A few days after receiving the SEC's request for documents, Little received a response from the South Dakota regulators outlining how Breitling had been advertising its securities offerings on a local television stations' website that allowed viewers to link directly to Breitling's website to begin the purchase process, and accused Breitling of offering and selling unregistered securities in the state.   Little forwarded the South Dakota correspondence to Faulkner and told Faulkner that he felt confident in his position but that if Breitling were forced to rescind any South Dakota investors, it would likely be something Breitling would have to disclose in its CIMs – something which Little had never advised Breitling it had to do with the other investors whose investments Little had helped Breitling to rescind.   The innocent Breitling Entities relied on Little's failure to provide the proper advice and as a result never provided the proper disclosures to investors.

82.     On January 3, 2013 Faulkner requested – and Little provided - a copy of the notes Little had taken during a meeting between the SEC and Faulkner.   Those notes indicate that Faulkner had misrepresented to the SEC – in Little's presence – that no investors had ever claimed they had been misled with respect to any of the Breitling's offerings.   Little took no action to correct these misrepresentations Faulkner made to the SEC.

83.     In the meantime, Crabb continued to approve CIMs for use by Breitling, including a new one in January 2013 for the Jericho prospect.

---

[9]   Later on January 4, 2013, Faulkner asked Little what would happen if Breitling didn't produce the documents that the SEC wanted, and Little responded that there was only a 30% chance that the SEC would take action to force the issue.   In a January 9, 2013 e-mail Faulkner asked Little if Breitling should just send the SEC "*more BS info*".

84.     On January 17, 2013, Breitling General Counsel Wagers began e-mailing documents to Little to produce to the SEC.   One spreadsheet document Little received from Wagers incorporated the balance sheets and income statements from 2012 for both BOG and BRC. That spreadsheet revealed that roughly 50% of BOG's revenues were spent on "lead generation and advertising" and that BOG was not accounting for investor liabilities on its balance sheet.   The BRC income statement indicated that close to 60% of BRC's revenues were consumed by "professional services" and that BRC was not accounting for investor liabilities either.   An Employee List Wagers sent to Little indicated that Michael Bowen, the Vice President of Sales for BOG, earned $481,033 in compensation in 2012 and also listed 3 different entities as "consultants" to BOG.  A similar Employee List for BRC listed five entities as "consultants" to BRC.[10]   Little produced these documents, along with the offering CIMs for 18 different prospects offered by Breitling, to the SEC.

85.     Two weeks later, on January 31, 2013 Little informed Faulkner that the SEC had obtained a Formal Order of investigation against Breitling and would be sending over Subpoenas. Little forwarded the SEC Subpoenas to Faulkner later that day.  Little and Faulkner exchanged multiple e-mails that same afternoon, with Little speculating that the SEC likely wanted Breitling's financial records to support a claim that Breitling's offerings involved "excessive promotions", and that **the SEC was likely investigating "*the same issue identified by [Investor #4's] attorney…that your AFE*" was overstated**.  Faulkner asked Little if the SEC might also be investigating whether Breitling was illegally paying sales commissions to its unlicensed sales staff.

---

[10]       All of these "consultant" entities were entities established and owned by Breitling's sales representatives to receive their illegal sales commission compensation from Breitling.

86.     On February 4, 2013, Breitling GC Wagers informed Little that lawyers from Vinson & Elkins would take over and handle the SEC investigation for Breitling but that it would not affect Scheef & Stone's handling of other legal matters for Breitling.

87.     Indeed a week later, on February 11, 2013, Wagers informed Little that yet another state securities regulator – this time from Nebraska - was investigating Breitling for engaging in general solicitation of investors.   Little communicated with the Nebraska regulator and learned that a Breitling sales rep had "cold called" a Nebraska resident to solicit an investment in a Breitling offering, the "Big Horn" prospect, and had described the investment as low risk and high reward.   Little advised Wagers of the claim but reiterated his legal position that because of the JOBS Act the rules prohibiting general solicitation were "moot".   The innocent Breitling Entities continued to rely on Little's advice and continued to engage in general solicitation to sell unregistered securities as a result.

88.     Perhaps as a result of the new "cold call" claim by the Nebraska regulators, on February 15, 2013, Crabb forwarded to Wagers the same securities sales process memos he had sent to Breitling back in October 2011.

89.     A few days later, Faulkner asked Little to handle yet another investor claim on the "Big Caesar" prospect.   Then on February 25, 2013 Hankins forwarded to Little a demand letter from another investor, Investor #6, claiming that he was misled on Breitling's Golden Ridge II offering, and demanded the return of his money or he would report his claim to the Texas State Securities Board.   Little prepared yet another settlement agreement for Investor #6.   Then on March 12, 2103 Investor #4's lawyer e-mailed Little that Breitling was in violation of the settlement agreement Little had negotiated with Investor #4 on Breitling's behalf.

90.     That same day, Handkins forwarded to Little another letter Breitling had received from Investor #6, this time making a claim of fraud as to the "Big Caesar II" prospect and alleging that Breitling had moved the drilling site for the Big Caesar II prospect without Investor #6's consent or approval.   Faulkner e-mailed Little – *"[w]hat's the plan Mitch"*?   Faulkner ultimately instructed Little to settle all of Investor #6's claims with Breitling returning his money.   But by the end of March Investor #6 informed Little that he had directly contacted the operator of the Big Caesar well and learned that the operator wasn't paying Breitling because Breitling hadn't paid the operator on some invoices.   Both Faulkner and Handkins disputed that, but for completely different reasons.   Little asked them to "*all get on the same page and figure it out so I can respond*" to Investor #6.

91.     While Little was trying to get clarity from Faulkner on how to settle Investor #6's claims, on April 3, 2013 Handkins advised him of a new investor claim, Investor #7, and the need to refund that client's claim because he was an accountant for another Breitling client, and Breitling didn't want "*the other guy getting ideas that he can get his money back*".

92.     On April 8, 2013 Little finally got around to asking Faulkner about Investor #6's allegations concerning Breitling's unauthorized transfer of his investment in the Big Caesar prospect to a different prospect in a different county.  Faulkner countered that it was "All B***S***".  The next day Faulkner asked Little if it would be a good idea to include an arbitration clause in all of Breitling's offering documents to "*assist in confidentiality in case anything goes south with any investor*" and Little responded that it was a "*very good idea*".   Crabb provided the arbitration clause insert to Faulkner, along with a "Small Business Issuer Limited Liability" clause insert, on April 11, 2013.

93.     On April 23, 2013 Handkins sent Little yet another investor complaint (Investor #8) on the Golden Ridge prospect.  Little offered that investor a rescission settlement, but then told Wagers and Handkins that he kept having problems "*as we rescind people out of Golden Ridge #2*" because Faulkner had asked him to get the "broadest release possible," but the investors were balking.    Then on May 7, 2013 Handkins advised Little that Breitling needed to do a total rescission for yet another investor (Investor #9) in the Big Caesar well.   On July 2, 2013, Little received a copy of an e-mail from yet another Breitling investor, Investor #10, alleging fraud by Breitling related to the "Pumpkin Ridge" prospect.  Faulkner e-mailed Little to draw up the "standard" rescission settlement agreement for Investor #10.

94.     Later, on July 29, 2013, Little forwarded to Faulkner an article from oil and gas industry publication "Petroleum News Bakken" which (he told Faulkner) somebody had sent to him "slamming you".   The news article reported that despite all of Breitling's press releases about its well prospects in the Bakken North Dakota shale play, the newspaper could find no evidence that Breitling had ever even drilled any of the wells it touted (including the Pumpkin Ridge wells and Big Caesar #1 and #2 wells), or had any ownership interest in any wells.  Little asked Faulkner about the article, and Faulkner told Little that it was a lie and that the newspaper had published a retraction.   Little asked for a copy of the retraction on several occasions, but Faulkner never provided the purported retraction to Little, Scheef & Stone otherwise performed no investigation to ensure that it was not assisting a fraud or violations of law pursuant to Defendants' obligations under Texas Disciplinary Rules 1.02 and 1.12 but instead continued to represent Breitling anyway. As described below, Breitling eventually sued the newspaper, but its case was dismissed and the court presiding over the case awarded over $100,000 in attorneys' fees to the newspaper.

95.     Just a few days later, Handkins forwarded a letter from yet another state securities regulator – this time the Kansas Securities Commission – seeking documents related to Breitling's offers of unregistered securities to residents of that state.   It turned out that the Scheef & Stone lawyer in charge of Breitling's Blue Sky filings, Sarah Benes, had mistakenly failed to file the Reg D statement for Breitling in that state.   Little and Crabb had to apologize to Faulkner, promising it would never happen again, and agreed that Scheef & Stone would pay the late filing fee itself. Little later sent a letter to the Kansas regulator falsely representing that the only persons making any offers or sales of securities were the principals of Breitling – Faulkner, Michael Miller and Parker Hallam – and that Breitling did not engage in general solicitation in Kansas or pay transaction-based commissions to any persons involved in any offerings in Kansas.

96.     In response to Little's letter, on September 4, 2013 the Kansas regulators informed Little that a Kansas resident had contacted them complaining that he had been solicited by Breitling sales representatives via a "cold call" and a follow up packet of offering materials that had been shipped to him by Michael Bowen, BOG's Vice President of Sales.   Little asked Faulkner how Breitling had obtained contact information for the prospective investors it had solicited in Kansas.[11]  Faulkner responded that the contact "lead" either came from Breitling's website or from a "lead" generating service company from Florida.   Later in September, Faulkner told Little that the "lead" generation company was called L&J, that Breitling had contacted "50 plus" prospective investors in Kansas, and that Breitling sent the offering "books" to all of them.

97.     On September 14, 2013 Wagers forwarded a demand letter directed to Breitling by a Houston law firm representing a couple (Investor #11) who had collectively invested over

---

[11]     Little also told Faulkner that he (Little) needed to get a "*better understanding of who Michael Bowen is and what he is doing*".

$700,000 in Breitling's Woodring, Buffalo Run, and Big Tex well prospects. The law firm alleged that Breitling had engaged in a scheme to defraud the couple since the beginning of the investment relationship. With respect to the Woodring well, the letter alleged that (as Little already knew) Breitling had stopped paying the operator, Crown, which had caused Crown to file a lien against the mineral estate, thereby clouding title to the lease for the well. Yet despite the fact that Breitling had stopped paying the JIBs to Crown, Breitling had continued charging the investors for the JIBs. The law firm further alleged that Breitling had fraudulently misrepresented the AFE and other material facts for the Buffalo Run and Big Tex 3 prospect wells and demanded that Breitling return over $587,000 to the law firm's clients.

98.     A week later Little sent Faulkner an e-mail that he was concerned about any potential lawsuit filed by the Investor #11 because "*it sounds like this has some hair on it for us*". Faulkner responded that "[*w]e need to settle it somehow*".

99.     On September 23, 2013, Faulkner forwarded to Little notes taken during his testimony before the SEC. The notes make clear that the SEC questioned the huge amount of money Breitling was spending on advertising and promotion, as well as Faulkner's lack of experience and qualifications in the oil and gas industry. Faulkner informed Little that it appeared to him that the SEC was "*shifting away from fraud*" and instead "*focusing on unregistered broker dealer/commissions*". Little asked Faulkner **"[d]id you document your bonuses as we suggested**", and Faulkner replied "100%".

100.     Three days later, Little informed Faulkner via e-mail that the Kansas Securities Commission was likely going to file some type of administrative action against Breitling for general solicitation and that the investor that Breitling's sales personnel had "cold called" was a Kansas state senator. Little continued "***I'm not naïve to the realities of your business, but it***

*sounds like there's a good bit of cold calling going on and books going out after one call*". Faulkner responded by denying Breitling was engaged in any cold calling and turned the tables on Little by asking *"[honestly, how much of this was generated you think from the lack of a blue sky filing?*"   Little told Faulkner to "[*h]ang tough and help me document this if you can*".

101.    Thereafter, on October 3, 2013, Little responded to the Kansas regulators that Breitling had followed all the rules and regulations in soliciting investors in Kansas, and (as he had done with the prior state regulators) argued that Kansas was preempted by the JOBS Act from regulating general solicitation of investors by Breitling.   The Kansas regulator asked Little if he had advised Breitling that the JOBS Act made it ok for Breitling to engage in general solicitation in Kansas, and Little responded that that was attorney-client privileged information.

102.    The next day, Faulkner copied Little on an e-mail involving yet another investor complaint [Investor #12] regarding the Big Caesar well.   Then on October 9, 2013, Handkins sent Little a sworn Affidavit of Michael Bowen for Little to use with the Kansas regulators.   Upon reviewing it, Little wrote back to Handkins that the Affidavit was not accurate because it misrepresented when Bowen had mailed the Breitling offering materials to the Kansas state senator.   Little forwarded the, as he described it, "false" sworn statement to Wagers a few days later.

103.    On October 16, 2013 Faulkner complained to Little and Crabb that Sara Benes had signed a Consent Order with the Arkansas Securities Commissioner (related to the late Reg D filing) without notifying Breitling and that it was now publicly available on the internet and showing up on Google searches.   Faulkner advised that if he had known about it, he "would have SEOed and ORMed around it".   Crabb apologized because he understood how much Faulkner "treasured" Breitling's online presence (since it was one of Breitling's chief marketing tools) and

explained that Benes had signed the Consent Order without notifying him, but assured Faulkner that going forward Crabb would personally take charge of supervising Breitling's Reg D filings.

104.    In the meantime, the Kansas regulators continued to insist that Little provide documentation on how Breitling had received contact information for and established a "pre-existing" relationship with the investors it had solicited in Kansas.  On October 28, 2013 Faulkner told Little that Breitling had gotten the "leads" from the "lead" generation company in Florida, and Little responded "***I was hoping to avoid telling them!***"   Faulkner asked Little if he thought Breitling could "build the relationship in this manner" but received no response from Little.  By March 2014, Little urged Faulkner to settle the Kansas regulatory matter by rescinding two of the Kansas investors and paying a fine because Breitling would lose its Reg D exemption if Kansas took regulatory action against Breitling.

105.    On November 1, 2013 Faulkner forwarded another investor demand letter to Little, this one alleging fraud on an Arizona investor (Investor #13) related to the Warrior and Big Caesar wells.  Faulkner asked Little to "*cram it back*" on the investor to "*get a reduction in what we pay him*".   Little responded that Scheef & Stone would "*get after him*".   But after several rounds of negotiations with the investor's Arizona counsel, Little advised Faulkner that while he might "***beat the rap…you probably won't beat the ride***", and that "***[i]f people start filing, you're done***.'  Faulkner responded "*[a]greed, need to avoid the filing of suits*."   Breitling ended up settling Investor #13's claim for rescission and paid him $166,000.00.

106.    On November 7, 2013, Handkins asked Little to work up another rescission settlement agreement for yet another investor (Investor #14).  On November 11, 2013, Crabb prepared another set offering documents for Breitling.  On December 3, 2013, Handkins sent Little a letter Breitling had received from the North Dakota Securities Department referencing a

"complaint" concerning one of Breitling's securities offerings and requesting documents related to Breitling's securities offerings in that state.   Little asked Handkins to provide him copies of all the offering documents used with North Dakota investors, and Little proceeded to prepare a response letter to the North Dakota regulator noting that there were 10 North Dakota investors in Breitling offerings.

107.    On December 9, 2013 Wagers forwarded to Little and Crabb a Press Release announcing the merger of BOG and BRC with a company called Bering to create a new publicly traded company to be called "Breitling Energy Corporation" (BECC).   A companion Press Release announced that BOG and BRC would be transferring their existing businesses and the "*administration and daily management of the investments of all of [BOG and BRC's] former clients*" to two newly formed entities, Crude Energy LLC and Crude Royalties LLC (collectively "Crude") under the management of Parker Hallam and Michael Miller (aka Dusty Rodriguez).   A week later Little sent an e-mail to Faulkner and Hallam suggesting that they meet to discuss and decide whether Scheef & Stone would represent Crude or the new Breitling entity (BECC) going forward.

108.    On December 17, 2013 Handkins sent Little another investor demand letter [Investor #15] -- addressed to Crude as the successor entity to BOG -- demanding rescission of an investment in the "Big Horn" wells in North Dakota because Breitling had failed to provide status information to the investor and the investor could not determine from North Dakota state records whether the wells even existed.

109.    Beginning in 2014 Scheef & Stone started working on securities law matters for the newly formed Crude entities.   On January 6, 2014, Little e-mailed Hallam to set up a meeting to discuss Crude's securities offerings and CIMs going forward.   During the subsequent meeting

Hallam informed Little and Crabb that Crude wanted its turnkey offerings to include a 4x AFE "promote" fee, and asked that Crabb and Little come up with language for the CIM that would only disclose that the actual AFE was less than the AFE disclosed in the CIM and that it was only an estimate from Crude. Little later e-mailed Hallam that he wasn't sure if Scheef & Stone could draft a CIM that "would accommodate a 4x promote".

110.    In February 2014, Crabb forwarded to Hallam new employment and compensation agreements for Crude to use with its employee sales representatives and independent contractor sales representatives, which included the same "performance bonus plan" structure that Scheef & Stone had implemented for Breitling years before to evade the restrictions on transaction-based compensation. Based on Scheef & Stone's advice, and unaware that such advice could result in the violation of securities laws, Crude implemented the securities sales commission/bonus structure recommended by Scheef & Stone and thereafter proceeded to pay its sales personnel sales commissions disguised as "bonuses" totaling in the millions of dollars.

111.    On July 24, 2014, Wagers provided Little with a copy of a lawsuit in which Breitling was sued by a sales rep from Florida, Kenneth Wheeler, who alleged that Breitling had stiffed him on sales commissions for investors he had referred to Breitling. Wheeler attached to his lawsuit a copy of an Investor Referral Agreement Faulkner had signed with Wheeler whereby BRC was to pay Wheeler a 7% commission on any investments with Breitling made by any investors referred by Wheeler. When Little saw that agreement, he told Wagers "***this is a big frickin deal from a securities standpoint. Who knew about it?***" Of course it was obvious that Faulkner knew about it since he signed the referral agreement with Wheeler. Yet Scheef & Stone performed no investigation to ensure that it was not assisting a fraud or violations of law pursuant

to Defendants' obligations under Texas Disciplinary Rules 1.02 and 1.12 and instead continued to represent Breitling.

112.    The next day, Wagers forwarded a new demand letter from a new law firm representing Investor #11, alleging that Breitling had misrepresented the locations of the Big Tex wells and had fraudulently inflated the AFE for the Buffalo Run well and demanding rescission. On August 8, 2014 Faulkner told Little to try and get Investor #11's claims settled via mediation.

113.    In the meantime, throughout 2014 Crabb continued to prepare offering materials, including CIMs, on behalf of Crude as the issuer.   In September 2014, Crude was contacted by the Wisconsin Division of Securities requesting information about Crude's advertising of securities in that state.  As had always been the case with Breitling, Crude turned to Little for assistance with that inquiry.   On October 17, 2014 Crabb e-mailed Crude's President Hallam that the Form D that Crabb had filed for Crude allowed Crude to engage in general solicitation under Rule 506(c) but that Crude had to verify accredited investor status.  Crude relied on Defendants' advice and continued to engage in general solicitation to sell unregistered securities.

114.    At the end of October 2014, Breitling received another investor demand letter from an investor's (Investor #16) counsel complaining that Breitling had substituted wells without his consent.   Little drafted the response letter and argued that the CIM for the offering in question allowed Breitling to substitute wells without the investors' consent.  Investor #16's counsel responded to Little by pointing out that the CIM was just a disclosure document and that the actual Subscription Agreement between Breitling and the investor did not contain any language that allowed Breitling to substitute wells.   He demanded rescission for the investor and threatened to file a lawsuit and a complaint with "all applicable regulatory agencies" if Breitling did not comply. As had become the typical pattern to keep Breitling in business, Little urged Faulkner to settle the

matter **"[a]s soon as possible so that he doesn't try to grow a brain and contact a regulator**". Faulkner eventually authorized the settlement of the claim.

115.    On December 8, 2014 Breitling forwarded to Little another investor demand letter [Investor #17] complaining about the Big Caesar and Golden Ridge offerings and demanding an audit.  Faulkner authorized but then delayed the audit until January 2015.   Then on February 17, 2015 Wagers forwarded to Little a website blog posting by Sharon Wilson that reported in detail how Faulkner was a hoax with no experience in the oil and gas sector who had left behind his web hosting company CI Host and a raft of lawsuits in 2010 to suddenly reemerge as the "Frack Master" with Breitling, boasting of vast experience in the oil and gas sector.  It described how many of the wells promoted by Breitling did not exist and how Breitling had sued Petroleum News for defamation over its July 2013 article claiming that Breitling did not have any oil wells in North Dakota and that the court had ruled against Breitling and awarded over $100,000 in attorneys' fees to the newspaper.   Scheef & Stone performed no investigation to ensure that it was not assisting a fraud or violations of law pursuant to Defendants' obligations under Texas Disciplinary Rules 1.02 and 1.12 and instead continued to represent Breitling.

116.    Little asked Wagers *"[w]hat on the website is false"*, and warned that if he sent a cease and desist letter to Ms. Wilson she might post it on the website and "*make it an even bigger deal*".   But Faulkner insisted he wanted to sue for defamation.  Little sought the advice of another Scheef & Stone partner, Shawn Tuma, who told Little that he found nothing "truly defamatory" about Faulkner or Breitling in the article because a lot of the article was just citing to publicly available source materials like lawsuits and other public filings.    Faulkner proceeded to file suit anyway against Ms. Wilson, which case was later dismissed.

117.    Despite all of the above, Scheef & Stone continued to represent Breitling and Crude throughout 2015.   In March 2015, Crabb sent offering materials for a new Crude offering to Faulkner.   Later that month, Crabb revised and sent to Faulkner new offering materials for a new company called Patriot.  A few days later Faulkner informed Crabb that Dusty "Michael Miller" Rodriguez had "branched off" to run his own new company called Patriot Energy Inc. under Faulkner's guidance, and asked Crabb to start doing the Blue Sky filings for Patriot.   Crabb asked Faulkner why he had set up a new company, Patriot, and Faulkner responded that Hallam was "rebuilding" Crude on his own but that "[i]t's not a good situation down there", that Crude had "moved and started Patriot", and that Patriot would henceforth be supervised by Faulkner, Handkins and Miller Rodriguez.  Faulkner told Crabb and Little to withdraw from representation of Crude and to only represent Patriot going forward.   Later in March, Crabb told Faulkner that Scheef & Stone had a conflict and could not represent Patriot and referred Faulkner to different securities counsel to represent Patriot – who rejected the representation.

118.    Later that same month, Wagers forwarded to Little an e-mail thread documenting a settlement negotiation and resolution between Breitling and CBS Radio settling claims by CBS Radio that Breitling had failed to pay for its radio advertising spots.   CBS Radio had been one of Faulkner's leading radio advertising providers.    After reading the e-mail thread, Little asked Wagers *"[a]re ya'll insolvent"*?   Little proceeded to draft the settlement agreement.

119.    In April 2015, the Texas Observer published an article about Faulkner entitled "*the Lite Guv and the Frack Master*" that described Faulkner as a fraud who had never finished college, had fabricated an "honorary" doctorate from Concordia College in California and was the subject of "dozens" of lawsuits by angry creditors and former employees from his days as an Internet entrepreneur.   Despite the gravity of the allegations, Scheef & Stone performed no

investigation to ensure that it was not assisting a fraud or violations of law pursuant to Defendants' obligations under Texas Disciplinary Rules 1.02 and 1.12 and instead continued to represent Breitling.

120.    In May 2015 Investor #17's counsel that had performed an audit on the records pertaining to the Big Caesar and Golden Ridge wells sent a demand letter to Little alleging fraud by Breitling and "sloppy" record keeping.    In June 2015, one of Little's partners forwarded him a new lawsuit filed against Breitling and Faulkner's wife by American Express.    Yet Scheef & Stone continued to represent Breitling and its related companies, and Little seemed more concerned about making sure Breitling kept paying Scheef & Stone's bills than making sure he wasn't assisting an illicit and fraudulent securities sales scam.    Scheef & Stone didn't finally stop representing Breitling and affiliated entities until October 2016.

121.    As the SEC has charged in the Enforcement Action, the Breitling private placement offerings that Scheef & Stone prepared and perpetuated (spanning more than five years) were premised upon material misrepresentations and omissions of material fact which, but for its negligence or complicity in Faulkner's schemes, would have been or should have been discovered by Scheef & Stone during its work involved in facilitating the offerings.    Information of which Scheef & Stone was aware, or should have been aware had it acted with the requisite standard of care and/or had it not been complicit in the illicit schemes, include without limitation:

- Faulkner had little to no experience in the oil and gas industry whatsoever (contrary to representations in the Breitling offering documents) and had several judgment and tax liens against him. It is clear that Faulkner was a control person of all of the Breitling Entities throughout Scheef & Stone's representation (including after the so-called "transition" to Crude).[12]

---

[12] Even the provenance of the BOG entity was misrepresented in the offering documents in question.

- Breitling was the subject of numerous investor rescission claims for securities fraud over the years;

- Breitling was the subject of multiple state securities regulatory investigations based on its advertising and promotional practices, including use of "cold calls";

- Breitling engaged in general solicitation using the Internet, Google Ads, radio ads, a "lead" generation service, and "cold calls";

- Breitling utilized unlicensed sales reps to market and promote its securities offerings and paid them sales commissions disguised as bonuses.

- Breitling made material misrepresentations in the CIMs regarding drilling and other costs, particularly with respect to the Approval for Expenditures ("AFE") documents attached to the CIMs which Scheef & Stone prepared.

- Breitling regularly oversold oil and gas units in Breitling offerings, without disclosure to investors, resulting in the substitution of properties which were not made with similar properties as required. Consequently, (1) the Breitling Entities were exposed to claims for rescission and/or damages; and (2) title to oil and gas assets (both in the hands of investors and remaining in the hands of the Receivership Entities) was undermined.

122.    All of the foregoing matters were to become the factual predicates for the SEC Enforcement Action and the attendant collapse of Faulkner's fraudulent scheme. Given Scheef & Stone's ongoing and pervasive involvement and contact with principals and personnel of the Breitling Entities, all of the above negative information either was discovered, or could or should have been discovered by Scheef & Stone in the exercise of reasonable diligence.

123.    Scheef & Stone was aware, or in the exercise of ordinary prudence as securities counsel should have been aware, that Faulkner was causing Breitling to engage in the offer and sale of unregistered securities by unregistered dealers – all of which exposed the Breitling Entities to tens of millions of dollars of rescission claims.   Scheef & Stone advised Breitling that its securities offerings were integrated and yet nevertheless ignored and failed to advise Breitling to cease its sales of unregistered securities once it was clear in 2011 that Breitling had blown the Reg D exemption by engaging in general solicitation, including advertising via the Internet, radio and

via "cold calls".   The Breitling Entities were otherwise unaware of the illegality of their actions in selling unregistered securities and would have heeded the correct securities compliance advice if it had been provided by Scheef & Stone.  Instead Scheef & Stone continued to assist Faulkner, Hallam and Miller to sell unregistered securities – even in the face of multiple and consistent state securities regulators' warnings about Breitling's violations of securities laws.  Scheef & Stone also recklessly took the position in 2012-2013, and negligently advised Breitling accordingly, that Breitling could engage in general solicitation based on the JOBS Act - despite the fact that the SEC had yet to publish any rules or regulations that allowed general solicitation – thereby exposing the Breitling Entities to even more rescission claims in the millions of dollars.    The innocent Breitling Entities relied on that advice to their detriment.

124.    Furthermore, having communicated with and participated in face to face meetings with SEC staff, Scheef & Stone was aware of the SEC's enforcement interest in the Breitling Entities' securities offerings.  After receiving the SEC subpoenas, Scheef & Stone assisted the Breitling Entities in responding to and producing documents responsive to said subpoenas, and Scheef & Stone thereby became aware of the subjects of the SEC's enforcement interests including, without limitation, documentation regarding Breitling's sales practices, solicitation of investors, and sales transaction-based compensation for Breitling's unlicensed sales personnel - which had been devised by Scheef & Stone.

125.    Upon receipt of the January 31, 2013 SEC subpoena, Scheef & Stone knew to a certainty that the SEC's informal inquiries had ripened into a formal investigation (which requires a showing of the factual bases for such an investigation).  In written communications with the SEC thereafter, Scheef & Stone lawyers were advised of the breadth of the SEC's investigation and became aware that the investigation was not limited to the activities of a single individual or

individuals. The extensive request for documents embodied in the SEC subpoenas clearly put Scheef & Stone on notice with respect to all of the substantive issues which eventually gave rise to the SEC Enforcement Action.  And Little was kept in the loop thereafter by Faulkner and other outside lawyers as to the scope and gravity of the developing SEC investigation.

126.    Moreover, Scheef and Stone lawyers continued to represent the Breitling Entities in the defense of numerous investor claims and complaints, many of which echoed some of the same questions raised and allegations made by the SEC, and should have caused Scheef & Stone to engage in further inquiry or due diligence with respect to its ongoing representation of BOG and its affiliates, including, without limitation, BRC, BECC and Crude, and ultimately either withdraw from said representation or "report up" the alleged violations within the Breitling Entities (and potentially to the SEC).

127.    Of particular significance, Scheef & Stone was aware of or in the exercise of ordinary care should have been aware that the AFEs in Breitling's CIMs were grossly inflated and fraudulent and calculated to mislead potential investors to believe that the costs for developing the wells on a turnkey basis would be much greater than the costs actually incurred. By inflating these cost estimates, Faulkner was able to obtain additional funds from investors which he misappropriated to the tune of tens of millions of dollars.  Scheef & Stone was aware of allegations concerning the fraudulent nature of the AFEs because the AFEs were a focus of various investor claims against the Breitling Entities that were handled by Scheef & Stone.   Yet despite their knowledge of the allegations of fraud surrounding the AFEs, Scheef & Stone performed no investigation to ensure that it was not assisting a fraud or violations of law pursuant to Defendants' obligations under Texas Disciplinary Rules 1.02 and 1.12 and in fact ***utterly failed to even bother to review the AFEs contained in the CIMs or ask any questions of Faulkner*** and instead

continued to prepare and pump out the CIMs that incorporated the fraudulent AFEs. Defendants neglected to recommend that Breitling take remedial actions with respect to Breitling's offering materials and so the innocent Breitling Entities were unaware that they were being manipulated by Faulkner into committing fraud.  The innocent Breitling Entities would have followed proper securities compliance advice and would have made the proper disclosures had such advice been provided to them.

128.    Scheef & Stone should have known of additional issues concerning the AFEs. For example, Scheef & Stone knew or should have known that Faulkner himself prepared all of the BOG (and later Crude) AFEs notwithstanding the industry norm of having the operator of the well perform this task.   Scheef & Stone also knew or should have known that Breitling, as a non-operator of the well, would lack information and control over drilling details and therefore the AFEs would be inherently inaccurate. And Scheef & Stone should have known that at least two AFEs included in Breitling offering documents were identical -- one simply having been copied from one CIM for a subsequent CIM.

129.    As set forth above, Breitling's private placement offerings -- with the material involvement and assistance of Scheef & Stone -- continued unabated through 2016 when the SEC's investigation ripened into an Enforcement Action alleging a massive and pervasive fraud.  Neither the civil investor claims handled by Scheef & Stone, the numerous state securities regulatory inquiries, nor the pendency of the SEC's investigation were ever disclosed to investors in the CIMs, which were prepared and disseminated with the material assistance of Scheef & Stone, and Scheef & Stone never advised the Breitling Entities to make such disclosures.   The innocent Breitling Entities were unaware that such disclosures were required, and would have made such disclosures if Scheef & Stone had provided the proper legal advice.

130.     Scheef & Stone's negligent and tortious conduct in its representation of the Breitling Entities was a substantial factor in the perpetuation and growth of Faulkner's fraud scheme.   The innocent Breitling Entities were unaware that Faulkner was manipulating them and causing them to violate securities laws by, e.g., causing them to market and sell unregistered securities that did not qualify for any exemption from registration because of the manner in which they were sold and in causing the Breitling Entities to pay sales commissions to unlicensed sales personnel, and Breitling relied and depended on Scheef & Stone to provide proper legal advice and to ensure that the Breitling Entities were compliant with securities laws.   The innocent Breitling Entities would have followed the correct securities compliance advice if they had received the proper advice from Scheef & Stone.   Scheef & Stone was duty-bound to either urge the Breitling Entities to cease offering their unregistered securities and violating securities laws or resign from its representation of the Breitling Entities once Scheef & Stone became aware of Faulkner's fraudulent and illegal conduct.    Instead, Scheef & Stone negligently advised the Breitling Entities that they could e.g., transfer "oversold" investors from the well prospects they originally invested in to other well prospects that they had never heard of without any legal repercussions.

131.     At a minimum, once it was on notice of potentially fraudulent or illegal conduct by Faulkner and Faulkner's manipulation and abuse of the Breitling Entities, Texas law is clear that Scheef & Stone had an ethical duty to investigate and should have initiated further inquiry with respect to the matters in question to ensure that it was not facilitating fraud or illegal acts.  Scheef & Stone should have insisted that Breitling issue corrective disclosures in connection with further sales and/or that rescission be offered to all of the defrauded investors. On the contrary, heedless of the substantial red flags cited above -- and with knowledge of the SEC's investigation and

similar private investor claims -- Scheef & Stone continued to assist Faulkner with ongoing illegal and fraudulent offerings and the legal matters arising from them. In doing so, Scheef & Stone put a stamp of approval on Breitling's operations, lending it a false aura of legitimacy and permitting Breitling's fraudulent offerings to continue unabated for a period of years until the SEC, Department of Justice and Internal Revenue Service intervened.

132.    Defendants' tortious, negligent and grossly negligent actions (and inactions) paved the way for Faulkner's use of the Breitling Entities as vehicles for his fraud, thereby enabling Faulkner to misappropriate more than $32 million in Breitling assets, clouding and risking loss of title to oil and gas-related assets, and exposing Breitling to over $100 million in increased liabilities, including without limitation substantial liabilities to professionals (particularly, but not exclusively, with respect to the administration of the Receivership Estate) and other creditors. But for Defendants' acts and omissions, the scale of the overall Breitling fraudulent scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

133.    When Defendants turned a blind eye to the red flags they encountered during their representation, they breached the duties that they owed to the Breitling Entities, who were Scheef & Stone's clients.  Aided by Defendants' negligence and/or intentional misconduct, Faulkner acted adversely to the legitimate interests of the Breitling Entities by causing the Breitling Entities to fraudulently sell tens of millions of dollars' worth of unregistered securities to investors, with very little of these funds remaining in segregated accounts for use for authorized purposes, thereby exposing the Breitling Entities to massive liabilities.  Instead, Faulkner diverted and distributed substantial sums to himself for his own personal benefit and in support of his lavish lifestyle. Despite their knowledge of the red flags which would have tipped off an attorney of reasonable skill and competence to Faulkner's fraud and violations of securities laws, Defendants refused to

lift the veil on Faulkner's fraudulent scheme. If Defendants had exercised even a minimum level of the independence, inquiry, and professional skepticism required of them, then they would have advised the Breitling Entities to cease the sale of unregistered securities by unregistered dealers and, at a minimum, augment their disclosures to investors and potential investors which would have revealed Faulkner's fraudulent scheme many years earlier, saving Breitling tens of millions of dollars in losses and increased liabilities that would not otherwise have been incurred, including increased liabilities to professionals and other creditors.

## V.      STATUTE OF LIMITATIONS DEFENSES

### A.  Discovery Rule / Inquiry Notice / Equitable Tolling

134.    The Receiver was appointed in the Enforcement Action on August 14, 2017 with respect to "***oil-and-gas related*** assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 108 at p. 1 (emphasis added). On September 25, 2017, the Receiver was appointed with respect to "***all*** assets – in any form or of any kind whatsoever – owned, controlled, possessed, or managed, directly or indirectly, by" Faulkner, BOG and BECC. *See* Case No. 3:16-cv-01735-D, ECF No. 142 at p. 1 (emphasis added). On September 12, 2018 the Court expanded the Receivership Estate to include Enforcement Action defendant Patriot and other Enforcement Action non-parties, including BRC. *See* Case No. 3:16-cv-01735-D, ECF No. 320 at p. 1. On March 26, 2019, the Court expanded the Receivership Estate to include Enforcement Action defendant Crude Energy and Enforcement Action non-party Crude Royalties. *See* Case No. 3:16-cv-01735-D, ECF No. 418 at p. 1.

135.    Pursuant to the Receivership Order, with respect to "a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party,

any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action." ECF No. 108 at ¶22, ECF No. 142 at ¶34, ECF No. 320 at ¶34, ECF No. 418 at ¶34. On September 3, 2019 the Enforcement Action Court entered an Order Granting the Receiver's Motion for Leave to Commence Ancillary Litigation (Case No. 3:16-cv-01735-D, ECF No. 478), stating that the provisions of Paragraph 34 of the Receivership Order tolling applicable statutes of limitation as to Defendants would remain in force for 60 days from the date of the Order. *Id.* at 2.

136.    Plaintiff did not discover and could not with the exercise of reasonable diligence have discovered until more recently, Defendants' negligence and participation in Faulkner's and others' breaches of fiduciary duties and the Breitling fraudulent scheme and the true nature of the injury suffered. Moreover, Defendants' wrongful acts were inherently undiscoverable. Plaintiff also asserts the doctrine of equitable tolling and adverse domination. Additionally, the Breitling Entities were not able to bring the causes of action asserted herein until they were "freed of [Faulkner's] coercion by the court's appointment of [the] [R]eceiver." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013).

## VI.    CAUSES OF ACTION

137.    For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

**COUNT I: Negligence/Gross Negligence**

138.    The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

139.    Defendants owed a duty to the Breitling Entities to exercise their professional responsibilities through the exercise of the degree of care, skill, and competence that attorneys of

reasonable skill and competence would have exercised under similar circumstances. Defendants' negligent acts or omissions breached that duty to Breitling. Defendants' negligence and/or gross negligence proximately caused injury to Breitling by enabling Faulkner to continue his fraud, thereby misappropriating over $32 million from Breitling, and by causing the Breitling Entities to suffer tens of millions of dollars of additional losses and increased liabilities, including without limitation millions of dollars in payments of illegal commissions to the Breitling sales personnel as well as professional and administrative liabilities incurred as a result of the SEC action and resulting Receivership. As a result of Defendants' breaches, Breitling suffered millions of dollars in damages. But for Defendants' acts and omissions, the scale and duration of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced. Defendants' conduct constituted gross negligence as that term is defined in TEX. CIV. P. & REM CODE § 41.001. Accordingly, Plaintiff is entitled to recover exemplary damages.

**COUNT II: Participation in Breach of Fiduciary Duties**

140.    The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

141.    Faulkner and the other directors and officers of the Breitling Entities, including but not limited to Wagers, Hallam and Miller, owed fiduciary duties to the Breitling Entities.  They breached their fiduciary duties by causing BOG, BRC, Crude and Patriot to sell unregistered securities using unregistered sales representatives in violation of securities laws and engage in an illegal fraudulent scheme that enabled Faulkner to misappropriate millions of dollars from the Breitling Entities, causing these entities to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities.

142.     Defendants knowingly participated in these breaches of fiduciary duties. Defendants knew Faulkner owed fiduciary duties to these entities, and Defendants were aware that Faulkner was breaching his fiduciary duties by manipulating and causing the entities to violate securities laws. Defendants also knew that they were aiding, abetting, or participating in these breaches of fiduciary duties by the conduct alleged herein. Faulkner's, Wagers', Hallam's and Miller's fiduciary breaches and Defendants' participation in these breaches enabled Faulkner to continue his fraud, misappropriating over $32 million from Breitling, causing these companies to suffer millions of dollars of additional losses, and causing them to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. But for Defendants' acts and omissions, the scale of the overall fraud scheme -- and its resulting harm to a number of the Receivership Entities -- would have been reduced.

143.     Defendants knew or should have known that their aiding, abetting, or participation in these breaches of fiduciary duties would result in extraordinary harm to the Breitling Entities. Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

## COUNT III: Aiding, Abetting, or Participation in Faulkner's Fraudulent Scheme
### [CLAIM DISMISSED]

144.     The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

145.     By its conduct described herein, Defendants aided, abetted, and/or participated with Faulkner in the fraudulent scheme carried out by him through Breitling. In particular, Defendants' services assisted the fraudulent scheme that enabled Faulkner to fraudulently offer securities to public investors and misappropriate over $32 million from BOG, BRC, BECC, Crude and Patriot.

Defendants' conduct caused these entities to suffer losses and caused these entities to incur millions of dollars of increased liabilities, including without limitation professional and administrative liabilities. As a result of this conduct, Defendants are directly liable for fraud, and their actions, in combination with the actions of Faulkner, are a proximate cause of actual damages to BOG, BRC, BECC, Crude and Patriot in the millions of dollars.

**COUNT IV: Avoidance of Fraudulent Transfers [CLAIM DISMISSED]**

146.    The Receiver incorporates by reference the preceding paragraphs as if fully set forth herein.

147.    Between December 1, 2013 and April 1, 2014, and at the direction of Faulkner, BOG and BECC made transfers totaling at least $331,637.48 to Scheef & Stone.

148.    Faulkner caused BOG and BECC to make these transfers with actual intent to hinder, delay, or defraud creditors of BOG and BECC. Scheef & Stone was engaged, and these transfers were made, at Faulkner's direction in furtherance of the fraudulent scheme alleged herein. Faulkner engaged Scheef & Stone in order to continue, and expand upon, his fraudulent scheme.

149.    Pursuant to the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE §24.001 *et seq.* ("TUFTA"), the Receiver may avoid these transfers from Breitling Entities to Scheef & Stone.

150.    Scheef & Stone cannot meet its burden of proof with respect to the TUFTA statutory affirmative defense (at § 24.009(a)). The good faith requirement of the TUFTA affirmative defense requires a transferee show objective, rather than subjective good faith -- *i.e.*, whether the transferee objectively "knew or should have known" of the fraudulent nature behind the transfers. *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Bankr. Tex. 2009). A transferee knew of the fraud if it had actual knowledge of the fraud. *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex.

2001). A transferee should have known of the fraud if it received a transfer with knowledge of facts that would excite the suspicions of a person of ordinary prudence and if diligence would lead to knowledge of the transferor's fraudulent intent. *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009); *see also Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005) (defining good faith as lack of awareness of transferor's intent).

151.    Scheef & Stone had actual knowledge of, or but for its negligence and gross negligence, should have known of, Faulkner's fraudulent misrepresentations made in the Breitling offering documents, his misuse of investor proceeds, and his misappropriation of millions of dollars in Breitling funds.

152.    The Receiver is entitled to his costs and reasonable attorney's fees as are equitable and just, pursuant to TUFTA § 24.013.

## VII.   **ACTUAL DAMAGES**

153.    The Breitling Entities have suffered losses of tens of millions of dollars as a result of the diversion and misappropriation of millions of dollars from them by Faulkner, tens of millions of dollars of losses based on uses of investor proceeds at the direction of Faulkner that were contrary to representations made to investors regarding how their money would be invested or used (including roughly $10 million in illegal sales commissions), and tens of millions of dollars of increased liabilities owed by Breitling to creditors, including without limitation professional and administrative liabilities, all as a result of Defendants' representation as attorneys for the Breitling Entities. These losses were proximately caused by Defendants' negligence and wrongful conduct. Additionally, the Receiver is entitled to the forfeiture of fees paid to Defendants as fraudulent transfers. The Receiver also is entitled to the recovery of its just and reasonable

attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to the Receiver. The Receiver has retained the undersigned attorneys and has agreed to pay them a reasonable attorneys' fee for their work.

## VIII.   PUNITIVE DAMAGES

154.   The Receiver's injuries resulted from Defendants' gross negligence, malice, or actual fraud, which entitles the Receiver to exemplary damages in an amount necessary to punish Defendants, and to deter similar conduct by others in the future.

## IX.   CONDITIONS PRECEDENT

155.   All conditions precedent to filing this Complaint have been met.

## X.   JURY DEMAND

156.   The Receiver demands a trial by jury.

## XI.   PRAYER

157.   The Receiver requests that Defendants Scheef & Stone, Crabb and Little be summoned to answer this Complaint, that the case be tried before a jury, and that upon final judgment the Receiver recover its damages as alleged herein, including its actual damages, punitive damages, and its costs and expenses of suit, including reasonable attorneys' fees. The Receiver prays for such other relief to which it may be justly entitled.

Dated: August 28, 2020

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
700 N. St. Mary's, Suite 1560
San Antonio, Texas 78205
Telephone:    210-630-4200
Facsimile:    210-630-4210

*/s/ Edward C. Snyder*
Edward C. Snyder
Texas State Bar No. 791699

esnyder@casnlaw.com
Jesse R. Castillo
Texas State Bar No. 03986600
jcastillo@casnlaw.com

***ATTORNEYS FOR THOMAS L. TAYLOR, III***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 28, 2020, the above and foregoing documents was

forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Edward C. Snyder*
Edward C. Snyder